' STATE vs. GEORGE A. ELLWOOD *alias* JAMES MARTIN.

In a criminal prosecution the State cannot produce evidence to show that the character of the accused was bad prior to the alleged crime, until the accused has himself put his character in issue.

To establish the identity of the accused, the State may show his flight soon after the offence charged against him, his assumption of disguise and of fictitious names, and such indications of a desire to evade prosecution. It may also show a photograph taken soon after the arrest of the accused, to explain his then appearance and his changed aspect at the trial.

To test the memory of a witness, much latitude is allowed a cross-examiner, but the cross-examiner may not pry into the private affairs of the witness which are foreign to the investigation; *e. g.*, when a jeweller is called to identify a stolen chain made by him some years before, he cannot be asked the approximate amount of business done by him yearly.

An accused person offering himself as a witness may be asked whether he has before been convicted of a crime similar to that for which he is on trial. It is not necessary for the State to show a previous conviction by producing the record.

Witnesses for the State may, in describing the appearance of the accused at the time of the burglary charged against him, make use of a mask, lantern, and similar implements to illustrate the description.

That the accused, September 10, received bullet wounds, is, together with the circumstances in which the wounds were received and treated, irrelevant evidence on his trial for a burglary committed nearly three weeks previous.

EXCEPTIONS to the Court of Common Pleas.

*July* 2, 1892. TILLINGHAST, J. The defendant, who was convicted of the crime of burglary at the September Term, 1891, of the Court of Common Pleas, brings up this case by bill of exceptions, and prays for a new trial on the ground of erroneous rulings by the court below during his trial.

The numerous exceptions taken by the counsel for the defendant are summed up by them in the following points, which we will treat as single exceptions, viz. : —

*First.* The State had no right to prove his previous bad character until he himself had put his good character in issue.

*Second.* That the defendant had the right to cross-examine any government witness to test his recollection, and to show the probabilities of his being able to recollect the alleged fact to which he had testified in his direct testimony.

*Third.* That the State had no right to introduce testimony tending to show that the defendant might have been engaged in the commission of some other offence.

*Fourth.* That the defendant could not be required to testify to any former conviction, except upon the production of the record of such former conviction.

*Fifth.* That the court in charging the jury had no right to presume that a witness for the defence was either wilfully falsifying or ignorantly mistaken.

*Sixth.* That the State had no right to exhibit and parade before the jury the implements ordinarily used in the commission of such offences as that charged against the defendant, until such implements were proved to be the property of the defendant.

*Seventh.* That the court erred in admitting immaterial testimony prejudicial to the defendant.

*Eighth.* The court erred in allowing the State to introduce and present to the jury a picture taken of said defendant, said picture being taken to be placed in the rogues' gallery.

The first and third exceptions may properly be considered together.

Of course there is no contention between the defendant's counsel and the Attorney General as to the correctness of these points as matter of law, and the only question therefore is, whether the State was allowed to prove the defendant's bad character, and his connection with the commission of some other offence in the manner suggested.

Walter Smith, a detective of the police department of Hartford, Conn., was permitted to testify, against the defendant's objection, that he heard Mr. O'Day say to the prisoner, "Your name is George Ellwood. You are wanted in Ohio. Is n't that so?" and that Ellwood made no answer; that in answer to the question, "What conversation did you have regarding who he was?" the witness answered, "As I said, Mr. O'Day said his name was George Ellwood, where he belonged, and that he was wanted in Ohio. He walked up to him and says, 'George Martin is not your name. Your name is George Ellwood. You belong in Ohio, and you are wanted there.' Mr. Ellwood did not answer."

Patrick O'Day was asked to state what was said by him or by

the defendant in relation to who the latter was. He answered as follows: "I said to him, 'I understand that you have informed the officers that you were shot in Worcester.' I told him I did not think his name was Martin."

Q. "How did you know about James Martin? Where did you get hold of the name?"

A. "He had told me that his name was James Martin on Friday morning."

Q. "Beginning on Friday morning, tell me about the conversation that was had as to his identity."

A. "I went into his room on Saturday; I saw him twice on Friday, and said I was satisfied that he was not James Martin, and told him about some other matter. On Saturday, after making investigation, I went to the hospital after dinner, and I said to him, 'Now, Jim, — I will call you Jim, but your name is *not* Jim, — of course you won't acknowledge who you are. You are wanted in Columbus; you are a fugitive from justice, and you are known as "Gentleman George," "George Ellwood."' He dropped his hands down, trembled, and returned me no answer."

Patrick Parker, a police detective of the city of Providence, was permitted to testify against the defendant's objection, as follows: "I then said to him that that chain and those studs had been identified as those that came out of Mr. Humphrey's house in Providence. He wanted to know who Mr. Humphrey was. I said he was the gentleman downstairs who had talked to him. . . . Mr. Watts finally came from Boston. Watts is the principal police inspector of Boston. Ellwood was on the bed when Watts came in. Watts asked Ellwood several questions. He looked over some *memoranda* he had, and finally said, very suddenly, 'You are the masked burglar, George Ellwood, known as "Gentleman George." You are wanted in Ohio.' Mr. Ellwood seemed excited. He afterwards smiled and said, 'No, I am not; you are mistaken.' Mr. Watts said, 'I was in New York when you were arrested for burglary: you had whiskers on at the time, and I am satisfied you are the man.' He said he was not the man. Mr. Watts said, 'You resemble him very much. Those eyes and that nose resemble George Ellwood very much.' He denied that he was the man, at the time."

The same witness was allowed to give a conversation which he had with the prisoner about his being arrested in the city of New York, in which conversation the prisoner stated that, after his arrest in that city, he was taken to Toledo and convicted under the name of George Ellwood, and was sentenced to ten years in the Columbus Penitentiary.

Testimony was also admitted that Mr. Porter, the deputy warden of the Ohio Penitentiary, said at the Central Police Station in Providence, in the presence of the prisoner, that he was George Ellwood, and that he was the man they were after, and that they were going to take him back to Ohio, and that said deputy told of the prisoner's escape from there.

This testimony, together with other of a similar character, tended strongly to show that the defendant was a man of bad character, that he had been previously convicted of the crime of burglary, and that he was an escaped convict from the Ohio Penitentiary. In short, it was placing before the jury, in advance of his becoming a witness in the case, a portion of the previous record of the defendant as a criminal, which record in no way connected him with the crime here charged against him. Moreover, a considerable portion of the testimony, if such it may be called, given by the detectives and other officials against the defendant, consisted of mere voluntary statements made by them to him, or to others in his presence, to which he made no reply. In other words, it practically amounted to the manufacturing, on the part of the state, of *ex parte* evidence against the defendant, of a highly prejudicial character. If it be said that most of this evidence was offered for the purpose of identifying the defendant, it is enough to reply that, while most of it doubtless tended very strongly to identify him as the perpetrator of another crime, yet we fail to see how it tended to connect him with this one.

In so far as the testimony related to what the defendant had said about his name, or the name that he was assuming, it was doubtless admissible as tending in some degree to establish his identity. Thus, the flight of the accused shortly after the commission of the offence, acts of disguise, concealment of person, the use of fictitious names, and similar *ex post facto* indications of a desire to evade prosecution, may be shown by the State. Whar-

ton's Criminal Evidence, 9th ed. § 750, and cases cited ; *Barron* v. *The People*, 73 Ill. 256 ; *Lanahan* v. *The Commonwealth*, 84 Pa. St. 80 ; *The People* v. *Hope*, 62 Cal. 291.

The testimony offered, however, went far beyond an attempt to establish these facts, and it was evidently so intended by the Attorney General. The first and third exceptions must, therefore, be sustained.

As to the defendant's second exception, we do not think it should be sustained. The witness, Edgar W. Martin, a manufacturing jeweller, was asked in cross-examination to give the amount, approximately, of the business of his firm in the course of the year. It had appeared in evidence that the chain in question was sold to Mr. Humphrey by the witness seven or eight years ago, and this question was asked for the purpose of showing what recollection the witness would be likely to have of a transaction which took place so long ago. We do not think that this was a proper way to test the recollection of the witness. The extent of his business was his own private affair, and the defendant had no right to inquire into it in this way. Moreover, it appears by the subsequent examination of the witness by the defendant, that the extent of his business in the manufacture of chains, similar to the one in question, was inquired into, together with the size, style, weight, and price thereof. This was all that was pertinent to the inquiry which was then being made. And while considerable latitude is allowed in the cross-examination of a witness, for the purpose of testing his recollection, yet this is no reason for permitting the cross-examiner to pry into the private affairs of the witness in regard to matters wholly foreign to the investigation. The second exception is therefore overruled.

We think the fourth exception should also be overruled. The defendant, who offered himself as a witness in his own behalf, was asked in cross-examination, against his objection, amongst other things concerning his previous record as a criminal, whether he had not been convicted of the crime of burglary, and sentenced therefor to imprisonment in the Ohio State Penitentiary for the term of ten years. His counsel excepted to the ruling of the court directing him to answer the question. There is considerable diversity of judicial opinion as to the right to inquire of a

witness on cross-examination whether he has not been convicted of a criminal offence; one class of authorities holding that, as the question involves the fact of a previous conviction, it ought not to be asked, because there is better evidence which ought to be offered, while the other class of authorities holds that such question may be asked of the witness. As to the former class, see Greenleaf on Evidence, 13th ed. § 457, and cases cited; *Hall* v. *Brown*, 30 Conn. 551, 557; *Hilts* v. *Colvin*, 14 Johns. Rep. 182; *Commonwealth* v. *Green*, 17 Mass. 515, 537. As to the latter class, see *Clemens* v. *Conrad*, 19 Mich. 170, and cases cited; *State* v. *Lawhorn*, 88 N. Car. 634; *State* v. *March*, 1 Jones' Law, N. Car. 526; Wharton's Criminal Evidence, § 432, and cases cited; *The People* v. *Cummins*, 47 Mich. 334.

While we are unable to say that the weight of the authorities supports the view taken in the latter class of cases, yet we are inclined to the opinion that they are based upon the better reason, and we therefore prefer to follow them.

As well stated by Chief Justice Cooley in *Clemens* v. *Conrad, supra:* "The reasons for requiring record evidence of conviction have very little application to a case where the party convicted is himself upon the stand, and is questioned concerning it with a view to sifting his character upon cross-examination. The danger that he will falsely testify to a conviction that never took place, or that he may be mistaken about it, is so slight that it may almost be looked upon as purely imaginary; while the danger that worthless characters will unexpectedly be placed upon the stand, with no opportunity for the opposite party to produce the record evidence of their infamy, is always palpable and imminent."

In Rapalje, Law of Witnesses, p. 337, the author says: "Where the witness under examination in a criminal trial is the accused himself, it is pretty well settled that he may be interrogated as to previous arrests and convictions, and even mere charges of crime, with a view to injure his credit." While the question involved in the exception now under consideration does not call for the adoption of so broad a rule as that last quoted, nor do we wish to be understood as approving of so broad a rule, yet it is pertinent, and meets with our approval in so far as it relates to previous *convictions* of the witness."

The fifth exception is also overruled.

Upon an examination of the entire charge of the court, which is made part of the record, we do not think it is open to the criticism which the defendant's counsel makes upon it in this exception. After a full and concise statement of the law applicable to the case, and while carefully summing up the evidence on both sides, the court, after referring to certain witnesses called by the defendant, whose testimony had been contradicted by other witnesses called by the State, said: "It is for you to consider all the reasons for their being at these different places. You must consider whether they are honestly mistaken, or wilfully falsifying; also, as to the man Johnson and officer Luby, the reasons they gave for being there, and whether they are probable, and such as commend themselves to your belief."

At the close of the charge, upon exception being taken by the defendant's counsel to that portion thereof above quoted, the court added the following explanation thereof: " I said that they might consider all the circumstances and all of the reasons given, and apply them as well to Mr. Luby and to Mr. Cox as to others. ' Gentlemen, you are to take them all. Do not single out one. These rules apply to all of the witnesses. Take all of the reasons given by all of the witnesses, apply the rules I have laid down to them all.; they are applicable to all of the witnesses, and to one side as well as to the other.' " This was certainly a fair and impartial statement, and one which was equally applicable to the witnesses produced by the State and those produced by the defendant.

The sixth exception is also overruled.

The record shows that the mask, lantern, and other implements produced at the trial were not offered in evidence by the Attorney General, and were only used by him for the purpose of enabling the witnesses to describe and illustrate the appearance of the burglar at the time of the commission of the offence.

We do not think that this was improper.

The seventh exception is based upon the ground that the court erred in admitting immaterial testimony prejudicial to the defendant. The exception relates specifically to the testimony of Dr. Willard Whitmarsh, of Worcester, Mass., the house surgeon of the

Worcester city hospital, who was permitted to testify, against the defendant's objection, that on the 10th day of September, 1891, he saw and examined the defendant in the accident room of said hospital; that the defendant gave his name as James Martin; that he was wounded, and that it was said that he had been shot; that the witness and others undressed the defendant, and witness minutely examined his wounds and dressed the same. The witness was also permitted to testify particularly with regard to the location, size, and nature of the wounds upon the defendant, and to give his professional opinion as to the cause thereof, and also as to the nature of a wound made by a pistol ball; also as to the physical condition of the defendant at the time of said examination, as to the condition of his clothing adjacent to said wounds, the extent of the hemorrhage from the wounds; and to give his opinion as to the length of time which had elapsed between the infliction of said wounds and said examination. He was further permitted to testify as to the articles which were found by him upon the person of the defendant, and the disposition which he made thereof; as to the conversation which he had with the defendant as to the instrument with which said wounds were inflicted; and generally as to all that was said and done by the witness and the defendant at the time of said examination.

The proof showed that the crime with which the defendant was charged was committed thirteen days prior to the making of said examination.

The Attorney General contends that the testimony above referred to was admissible for the purpose of identifying the defendant, and, taken in connection with other testimony subsequently offered, connecting him with the commission of the crime charged against him.

We fail to see the relevancy of the greater part of this testimony at the time it was offered, nor do we find that it was made relevant or pertinent by any testimony which was subsequently put in. The fact that the defendant had received two bullet wounds on or about the tenth day of September, 1891, together with the circumstances connected therewith, as minutely detailed in the testimony, had nothing whatever to do with the commission of the crime for which the defendant was being tried, and, from the manner in

which it was offered, could not have failed to prejudice his case with the jury.

That part of the testimony which related to the effects found upon his person, and what he said concerning the same, was doubtless pertinent as tending in some degree to connect him with the crime aforesaid. But, for the reason already given, we think the main part thereof was irrelevant and inadmissible. Conversations had with a person accused of crime are not admissible in evidence against him, merely because they were had while he was under arrest. But they are admissible, if at all, in whole or in part, because they are pertinent to the question at issue. And it by no means follows, because a part of a conversation thus had is admissible, that the whole of the same is also admissible. See *Commonwealth* v. *Campbell*, 30 North Eastern Reporter, 72, issue. of March 18, 1892; *Boyd* v. *United States*, 142 U. S. 450; Wharton's Criminal Evidence, § 64; *People* v. *White*, 14 Wend. 111; *State* v. *La Page*, 57 N. H. 245. The seventh exception is therefore sustained.

The eighth exception is overruled.

The picture of the defendant was introduced for the purpose of showing how he looked at the time it was taken, which was shortly after his arrest, as compared with his appearance at the time of the trial, he having in the mean time grown a moustache and otherwise somewhat changed in his personal appearance. It was therefore relevant for the purpose of identification.

*Exceptions sustained as above stated, and case remanded for a new trial.*

*Robert W. Burbank*, Attorney General, for plaintiff.

*Charles F. Baldwin & Edward A. L. Gannon*, for defendant.