**309 A.2d 855.**

STATE *vs.* NICHOLAS A. PALMIGIANO.

OCTOBER 10, 1973.

PRESENT: Roberts. C. J., Paolino, Kelleher and Doris, JJ.

KELLEHER, J. These are two indictments. One charges Nicholas A. Palmigiano and Gelardo Mastracchio with robbery. The other charges Palmigiano and Mastracchio with a felony murder. The indictments were consolidated for trial in the Superior Court. The jury returned guilty verdicts on both indictments. The exceptions presently being considered are Palmigiano's.

On Thursday, April 10, 1969, at approximately 8 a.m. in Providence a Brink's armored truck left its terminal and headed for the Harris Avenue plant of the H. P. Hood & Sons, hereinafter referred to as "Hood's". The vehicle's crew consisted of a driver, Joseph P. Bova, and two armed messengers, James A. Sullivan and John Glendinning. Part of the truck's cargo was a suitcase containing $10,000

in cash. Thursday is payday at Hood's. The truck was to stop at Hood's where Glendinning would go to a second floor office with the $10,000 and cash employees' paychecks. The day's schedule called for the truck, after leaving Glendinning at Hood's, to proceed to an optical manufacturer where Sullivan would perform the same task Glendinning would be doing at Hood's.

The truck made its way to Dean Street where it proceeded in a northerly direction to a ramp which permitted entrance onto Harris Avenue. Just prior to arriving at the ramp, Bova noticed to his front a Honda motorcycle, The cycle's operator wore a white helmet and a dark jacket. The truck turned right and proceeded down the ramp to Harris Avenue. Once it reached Harris Avenue, the truck made a U-turn so that it could park at Hood's front door. Bova observed that the cycle came down the ramp and cut across Harris Avenue towards a driveway which ran along the westerly portion of the premises owned by Brownell & Field Company. Brownell & Field is Hood's next-door neighbor. It markets and distributes a line of coffee and tea products under the trade name "Autocrat."

Once the truck stopped at Hood's, Sullivan left the truck, entered the Hood plant and inspected the stairway leading to the second floor. He returned to the sidewalk and indicated to Glendinning that everything was in order. Glendinning, suitcase in hand, left the truck and entered the building. Sullivan returned to the vehicle, prepared to go to the next job when a woman came out of the doorway and shouted, "They're holding him up."

A volley of shots was heard and within a matter of seconds a person carrying a gun and a Brink's suitcase charged through the entranceway onto the sidewalk. The person wore a wig and sunglasses and the Brink's men were in doubt as to the robber's sex. The robber started running easterly along the sidewalk toward Brownell & Field. Sulli-

van fired two shots. He and Bova started to chase the robber. Bova ordered Sullivan to return to the truck and secure its contents. Sullivan secured the truck and went into Hood's premises to check on his co-worker. He found Glendinning mortally wounded, sprawled on a landing midway between the first and second floors.

In the meantime, Bova had pursued the robber into the Brownell & Field property. The felon ran down the alleyway, jumped up onto a loading platform, and disappeared into the warehouse portion of Brownell & Field. During the chase, the robber lost or discarded a pocketbook, the suitcase, the wig, the sunglasses, a glove, and a pair of women's flat-heeled shoes. Sometime during the pursuit, the thief turned and pointed at Bova. As Bova retrieved the suitcase and its $10,000, he saw his quarry run out a side door, jump into a station wagon, and drive out the alleyway onto Harris Avenue. Bova also testified that the motorcycle he had seen near Brownell & Field's driveway had disappeared once the gunman had made good his getaway. The "Autocrat" station wagon was found abandoned in the Eagle Park section of the city at approximately 8:40 a.m. One of its door panels was stained with blood. Thanks to the assistance of a concerned citizen, a search of the underbrush on a lot located near Palmigiano's house uncovered a pistol.

Sometime later in the morning, Palmigiano was arrested at a relative's house. He had been wounded on the left arm.

At the trial, a Hood's salesman testified that at 8:10 a.m. as he went up the stairway to the office, he passed an individual who he thought was a lady wearing a gray pantsuit, a pair of black shoes, and a red ribbon in her hair. Shortly after he entered the office, the salesman heard shots. A member of the office staff told of how when she entered the stairwell, she saw Glendinning standing on a

landing. She observed a person whom she thought to be a woman pointing a gun at the Brink's employee. Once she heard the "woman" talk, the employee was sure the "she" was a "he." Experts from the Federal Bureau of Investigation informed the jury that (1) fingerprints found on the station wagon's steering wheel matched those of Palmigiano; and (2) that the gun found in the lot was the murder weapon. Bova identified Palmigiano as the person he chased in, around, and about Brownell & Field. Two witnesses, who were standing near the entrance of Brownell & Field's alleyway as the station wagon went by them onto Harris Avenue, identified Palmigiano as the driver. A driver-salesman for Brownell & Field identified Palmigiano as the person he noticed standing in the main entrance of Brownell & Field shortly before the holdup. The salesman at first thought the standee was a woman but when he had taken a third look, he noticed the "woman's" five o'clock shadow was showing through a white powdery substance that covered "his" face.

Palmigiano's defense was an alibi. Testimony was offered to show that at the time the Hood's holdup was taking place, Palmigiano was drinking coffee in a restaurant located many miles away from the shooting. Palmigiano explained the bullet wound by telling the jury that after coffee, he drove to the bus terminal on Sabin Street, Providence, where he met an individual who owed him money. They proceeded to Roger Williams Park. When they arrived at the park, Palmigiano and the debtor argued over the payment of interest. The borrower eventually refused to pay back the entire loan, pulled a gun, and then shot Palmigiano in the wrist.

In his bill of exceptions, Palmigiano alleges a denial of his constitutional rights. We do not agree.

# I

## The Right to a Speedy Trial

The robbery and murder occurred on April 10, 1969. The indictments were returned on April 28. Palmigiano was arraigned on May 21. He filed his motion for a speedy trial on July 14. His trial began on June 9, 1970, some 11 months after the filing of his motion.

Within the past few months, we have stressed that since the right to a speedy trial is a relative one, a determination of whether that right has been violated must be determined on a case-by-case basis. *State* v. *Palmigiano,* 111 R. I. 739, 306 A.2d 830 (1973). In making such a determination, consideration is to be given to several factors such as the length of delay, the reason for the delay, the demand or lack of demand for a speedy trial, and the prejudicial effect of the delay. *Barker* v. *Wingo,* 407 U. S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); *Tate* v. *Howard,* 110 R. I. 641, 296 A.2d 19 (1972).

The length of delay in this case, 11 months, is shorter than the 16-month period in *Tate,* and much briefer than the 22-month interval in *Palmigiano.*

The docket entries give a good insight into the cause for the delay. Initially, Palmigiano asked that he be admitted to bail. On July 30, 1969, his then attorney filed a motion to withdraw. This motion was granted on August 7, 1969. Three months later, a series of motions was filed asking all sorts of discovery. At that point, Palmigiano had no counsel of record. His present counsel, a member of the Massachusetts bar, filed an entry of appearance on November 12. However, no local counsel entered an appearance until December 8.

This court is aware that during the months of February and March, 1970, Palmigiano's present counsel was engaged in a lengthy trial in Superior Court. *State* v. *Lerner,*

112 R. I. 62, 308 A.2d 324 (1973). We are acutely conscious of the accused's right to a speedy trial but where the delay is attributable to the accused's pretrial maneuverings, we must look upon the claim of constitutional infringement with a somewhat jaundiced eye. *Marzilli* v. *Howard,* 108 R. I. 309; 274 A.2d 902 (1971).

It is interesting to note that Palmigiano made no assertion of his sixth amendment right until his effort to be released on bail had fallen on deaf ears.

The defense made a belated effort to show the requisite prejudice. After both sides had rested, Palmigiano, renewed his motion for dismissal,[1] made some oblique reference to a question posed by "Prosecutor Pettine" to "Dr. Harrison." There was no attempt to pinpoint the time and setting of the inquiry.

"Prosecutor Pettine" is now Raymond J. Pettine, Chief Judge of the United States District Court for the District of Rhode Island. While he once was an assistant Attorney General, he left this office many years ago.[2] "Dr. Harrison" was Dr. Harold C. Harrison, the assistant director of the University of Rhode Island laboratories of scientific criminal investigation. *See State* v. *Andrews,* 86 R. I. 341, 134 A.2d 425 (1957). He died on April 26, 1970, about a month and a half prior to the commencement of Palmigiano's trial.

The quoted reply of Dr. Harrison apparently indicated that he would differ with the prosecution's expert who told the trial justice and the jury that in modern fingerprint identification procedures, there is no set number of identity points which are required for a positive identification. The expert explained that he would never attempt an identi-

---

[1]The motion for dismissal was first made on the opening day of trial, June 9, 1970. Testimony concluded on June 29, 1970.

[2]Judge Pettine terminated his state service in April, 1961 to become the United States Attorney for the District of Rhode Island.

fication unless he could find at least seven points of comparison. The expert made it clear that there were nine points of comparison in the diagram he had prepared for the trial, and that there were eleven points where a comparison could be made between Palmigiano's prints and those on the steering wheel.

Our difficulty with the defense's claim of prejudice is the absence of any evidence as to when Dr. Harrison gave his reply to "Prosecutor Pettine" and whether in the light of the progress made in the science of identification by comparison of fingerprints Dr. Harrison's opinion had remained fixed.

In summary then, we find that any delay in bringing Palmigiano to trial cannot be laid at the feet of the state. The presence of prejudice is so problematical as to verge on the bounds of speculation. There is no evidence whatsoever that had Dr. Harrison been available at trial time,[3] he would have testified as he might have at some unidentified hearing many years ago. It should be remembered that the constitutional right to a speedy trial does not require the state to break the track record every time an indictment is returned or a complaint issued. While justice should be administered with dispatch, the thrust of the sixth amendment guarantee is not mere speed but an expeditious disposition of a pending action. *Smith* v. *United States,* 360 U. S. 1, 79 S.Ct. 991, 3 L.Ed.2d 1041 (1958).

## II

### Fair Trial, Due Process
### and
### Right to Counsel.

Palmigiano is no stranger to the courts. During cross-examination, he admitted on four different occasions that

---

[3]Palmigiano produced an expert whose testimony differed from that of the FBI expert.

he had been convicted of various crimes relating to either robbery, breaking and entering, or possession of burglar's tools. The defendant's brief contains an excellent compilation of professional and judicial writings which points out the potential prejudicial effect of describing the accused's prior convictions.

In Rhode Island, the right to impeach a witness's credibility by showing previous convictions is statutory. General Laws 1956 (1969 Reenactment) §9-17-15. This statute has been the subject of extensive judicial consideration. *Mercurio* v. *Fascitelli*, 107 R. I. 511, 268 A.2d 427 (1970); *State* v. *McCartin*, 106 R. I. 674, 262 A.2d 826 (1970); *State* v. *Ellwood*, 17 R. I. 763, 24 A. 782 (1892); *State* v. *McGuire*, 15 R. I. 23, 22 A. 1118 (1885).

Much of Palmigiano's argument finds its answer in the *Mercurio* case where we pointed out that if change is to be sought, it should originate in the state house, not the courthouse. The introduction of this type of evidence is a matter addressed to the trial justice's discretion. We can see no abuse of that discretion.

One portion of this phase of Palmigiano's appeal that deserves some extended discussion is his contention that the state, upon introducing the record of his past convictions, had to prove that at the time of conviction he was represented by counsel or that he had waived this particular constitutional right.

In *Loper* v. *Beto*, 405 U. S. 473, 92 S.Ct. 1014, 31 L.Ed. 2d 374 (1972), a plurality of the Supreme Court held that, absent a waiver, the record of an uncounselled prior conviction could not be used to impeach a witness's credibility. Mr. Justice White whose concurrence made the plurality holding clear, emphasized that the rule in *Loper* is subject to the harmless constitutional error declarations of *Harrington* v. *California*, 395 U. S. 250, 89 S.Ct. 1726,

23 L.Ed.2d 284 (1969); *Chapman* v. *California,* 386 U. S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

We are bound by the *Loper* holding. However, we believe there is a predicate to its invocation and that is some showing by the witness that he was not represented by counsel at the time of the entry of his past convictions. Here, there is no positive representation by Palmigiano that he had been deprived of counsel during the disposition of four indictments which served as the basis for the four convictions admitted to by Palmigiano during his cross-examination. At no time, when he was on the stand, did he ever say he was not represented.

In fact, a cursory search of the files of the Superior Court shows that on three of the four times he was sentenced Palmigiano was represented by private counsel. The only uncertainty is as to one indictment and at this juncture we cannot tell whether at that particular time defendant had counsel. For the purpose of disposing of this particular claim, we shall assume that defendant was not represented on the fourth indictment. The inclusion of this one conviction in the light of the overwhelming evidence that places Palmigiano in Hood's stairwell at 8:15 a.m. on Thursday, April 10, 1969, is harmless error beyond a reasonable doubt.

Palmigiano also complains that his right to counsel was abridged when the trial justice refused to allow Palmigiano's counsel to speak to witnesses during various recesses while they were in the midst of cross-examination. We have said that this is a matter which lies within the sound discretion of the trial justice. *State* v. *Lerner, supra.* The defendant has failed to persuade us that the trial justice abused his discretion.

Palmigiano sought a mistrial on the ground that the members of the jury observed him in handcuffs as the sheriffs escorted him into and out of the courthouse. The

motion was based upon his counsel's understanding that what he said was an actual fact. There is no proof that any of the jury saw Palmigiano while he was handcuffed. The trial justice, in denying the motion, observed that it was obvious that Palmigiano was in custody. In his charge to the jury, the trial justice told the jurors that both defendants were entitled to a fair trial and it did not matter that one defendant was in custody while the other was on bail. Palmigiano offered no challenge to these comments. It is clear that the jury was cognizant that Palmigiano's locomotion was restricted. We believe that one juror who sees a defendant in handcuffs is as apt to be filled with compassion as another juror who might feel the defendant's guilt has been established by the sheriff's ill-timed security effort. Palmigiano had the burden of proving prejudice and he has failed to do so. The denial of the motion for a mistrial was proper.

Sergeant Angelo P. Ricci is a veteran member of the Providence police department. On the morning of the holdup he was assigned to a motorized patrol section whose area of responsibility encompassed the Eagle Park-Elmhurst areas of Providence. He reported for duty at 7:45 a.m. Sometime near 8:15 a.m. he heard of the Hood holdup. Later, he was proceeding toward police headquarters when the radio in his cruiser alerted all members of the department to be on the watch for a white-helmeted, dark-jacketed motorcyclist who was last seen in the area of Harris Avenue. The message gave the registration number of the motorcycle and the name "Gerald Mastracchio."[4]

The sergeant abandoned his trip to headquarters and proceeded forthwith to his patrol area where he took a post so that he could maintain a constant watch of the home of

---

[4] In the record there is evidence indicating that sometime prior to the Hood's holdup, certain police officers had been told that Mastracchio had been planning something like the April 10, 1969 incident.

Mastracchio's mother. At approximately 10:15 a.m., he observed a cyclist who matched the radio description riding along Admiral Street past Mrs. Mastracchio's residence. The officer pursued the cyclist and stopped him near the corner of River Avenue and Eaton Street. The cyclist was Mastracchio.

Sergeant Ricci testified that two days prior to the hold-up, he had observed Mastracchio driving a Honda motor-cycle on Vandewater Street. His back-seat passenger was Palmigiano. The officer also stated that several times during the preceding six-months, he had seen Palmigiano and Mastracchio in each other's company.

Palmigiano objects to the testimony as to the contents of the radio message as "pure hearsay" which is as prejudicial to him as to his co-defendant and claims that in the light of this testimony the trial justice should have granted his motion for a severance.

We will once again emphasize that the rule barring .the use of hearsay evidence applies only to an. out-of-court utterance which is being offered for the purpose of establishing the truth of the matter contained therein. *State* v. *Clark,* 112 R. I. 270, 308 A.2d 792 (1973); *State* v. *Vaccaro,* 111 R. I. 59, 298 A.2d 788 (1973); *Martin* v. *Estrella,* 107 R. I. 247, 266 A.2d 41 (1970); *State.* v. *White,* 107 R. I. 306, 267 A.2d 414 (1970); *Allen* v. *D'Ercole Constr. .Co.,* 104 R. I. 362, 244 A.2d 864 (1968).

The entire purpose of Sergeant Ricci's testimony was to show why he apprehended Mastracchio. It was not objectionable hearsay because the radio message was not offered to prove Mastracchio's guilt. *Nash* v. *United States,* 405 F.2d 1047 (8th Cir. 1969); *Boles* v. *State,* Ind., 291 N.E.2d 357 (1973); *People* v. *Garcia,* 31 Mich.App. 447, 187 N.W.2d 711 (1971); *State* v. *McRoberts,* 485 S.W.2d 70 (Mo. 1972); *State* v. *Shadding,* 17 N.C.App. 279, 194 S.E.2d 55 (1973); McCormick, *Evidence* §248 at 587 (2d ed.

1972); 1 Wharton, *Criminal Evidence* §274 at 25 (13th ed. 1972). The trial justice's overruling of Palmigiano's exceptions to Sergeant Ricci's description of the contents of the radio message and the denial of the severance motion were correct.

The final exceptions to be considered are those taken to the denial of Palmigiano's motions for the production of grand jury minutes, exculpatory evidence, illegally obtained evidence, and the names and addresses of those individuals who were offered inducements to testify either at trial or before the grand jury.

The motion for production of the grand jury minutes was initially made at a pretrial hearing conducted in early December, 1969. During the trial, defendant would at the conclusion of each prosecution witness's direct examination ask for the grand jury minutes so that he could cross-examine the witness.

We have reiterated our view that a defendant may examine the minutes of a grand jury's proceedings once he has demonstrated a particularized need for their production. *State* v. *Lerner, supra; State* v. *Ouimette*, 110 R. I. 747, 298 A.2d 124 (1972). We have stressed that the need must be established at the trial court level. *State* v. *Clark, supra; State* v. *Carillo*, 112 R. I. 6, 307 A.2d 773 (1973). A defendant may not make a motion for discovery and then do nothing but hope for lightning to strike. It is his burden to show some extraneous circumstances which warrant a belief that a witness's in-court testimony might be vulnerable because of potential inconsistencies which might be uncovered by a comparison of that testimony with what he told the grand jury.

A motion for the grand jury minutes must be supported by something more than what appears in this case. The defendant relies on *Schlinsky* v. *United States*, 379 F.2d 735 (1st Cir. 1967), for the proposition that his statement

that he desired the minutes so that he could cross-examine the witnesses shows the requisite need. The *Schlinsky* case in turn cites *Dennis* v. *United States,* 384 U. S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966), as the basis for its view that a request such as was made by Palmigiano's counsel during the trial establishes the particularized need.

However, our study of *Dennis* strengthens our belief that an asserted need for grand jury minutes to cross-examine a prosecution witness cannot be equated with the "particularized need" which is required for production. In *Dennis,* the Court, in finding the necessary need, stressed the time element which was peculiar to that case. The events which led to the charge against Dennis occurred during 1948-55. The grand jury considered the case in 1956, while the actual trial did not begin until 1963. Furthermore, one of the witnesses in *Dennis* admitted on cross-examination that he was mistaken in earlier statements about significant dates. These were the factors that caused the Court in *Dennis* to find the particularized need.

The mere desire of a defendant to search for impeaching material for use in cross-examination does not in our opinion entitle him to the production of the grand jury's records. Disclosure of these records is a matter of some concern to the trial justice. He must evaluate the request in the light of the particularized need alleged and shown. In reviewing the exercise of the trial justice's discretion in this matter we must balance the need for secrecy against a defendant's ability to present an adequate defense. *Paz* v. *United States,* 462 F.2d 740 (5th Cir. 1972). We conclude that the trial justice did not err in denying Palmigiano access to the minutes.

At the pretrial hearing an assistant Attorney General informed the court and defense counsel that the prosecution did not have in its possession any exculpatory or illegally obtained evidence. He further assured all parties that no

rewards or promises had been made to any one who had appeared before the grand jury or might testify at the trial.

The defendant, when urging these motions, made no suggestion that the prosecution was concealing such evidence or that it had offered inducements to the witnesses who appeared before the grand jury or the potential trial witnesses. The mere making of such motions is not enough. A defendant must present to the trial justice some reasonable basis why affirmative action should be taken on his requests. This he has failed to do.

Although there is agreement that a criminal trial, like any trial, should be a search for truth rather than a game of cat-and-mouse, we know of no constitutional mandate that the prosecution must open wide its investigatory files to a defendant whose sole motivation is a forlorn hope that affirmative action by the trial justice might result in the release of something which, he hopes, might cast a shadow on the prosecution's case or its activities. The sole accomplishment of such a carte blanche view would be an undue delay of trials. As we said in *Tate, supra,* the right to a speedy trial is a two-way street! The defendant unquestionably has a right to a speedy trial and the public has a right to expect that an accused will be tried while the witnesses are alive and available.

The defendant's exceptions are overruled and the case is remanded to the Superior Court.

Joslin, J. did not participate.

*Richard J. Israel,* Attorney General, *Donald P. Ryan,* Asst. Attorney General, for plaintiff.

*Breslin, Sweeney, Reilly & McDonald, Stephen J. Fortunato, Jr., Ronald J. Chisholm* of Boston, Mass., for defendant.