STATE

v.

**John A. MORETTI.**

No. 85–167–C.A.

Supreme Court of Rhode Island.

March 6, 1987.

Arlene Violet, Atty. Gen., Jane M. McSoley/Thomas Dickinson, Sp. Asst. Attys. Gen., for plaintiff.

William F. Reilly, Public Defender, Janice M. Weisfeld/Barbara Hurst, Asst. Public Defenders, for defendant.

## OPINION

KELLEHER, Justice.

This tale of a West Warwick fire should serve to remind members of the State Fire Marshall's office as well as municipal firefighters assigned to investigate the cause of a fire that their investigatory efforts may be subject to the constitutional prohibition against unreasonable searches and seizures.

The defendant, John A. Moretti (Moretti), comes before this court on appeal from his conviction by a Providence County Superior Court jury on a charge of first-degree arson. Moretti claims that his conviction was obtained with evidence gathered in violation of the constitutional prohibition against unreasonable searches and seizures, and that the trial judge erred in allowing cross-examination of Moretti as to his prior misdemeanor convictions resulting from guilty pleas that were allegedly entered without benefit of counsel and did not bear upon his propensity for truth and veracity.

At approximately 8 p.m. on March 12, 1984, Moretti called and reported a fire in his apartment at 6 Robert Street in West Warwick. West Warwick firefighters responded and extinguished the blaze. Sometime after 9 p.m. Don A. Centracchio (Centracchio), chief inspector of West Warwick's Fire Prevention Bureau, arrived at the scene after receiving a call from a battalion chief. The chief informed Centracchio of the presence of irregular burn patterns and the strong odor of alcohol on a rug, thereby raising the possibility that the fire was incendiary rather than accidental in origin.

The firefighters had yet to complete their duties when Centracchio entered the premises to investigate the cause and origin of the fire. Still to be completed was an "overhaul" of the fire scene, a standard procedure whereby firefighters search for indications that an extinguished blaze could be rekindled.

After an examination of the premises Centracchio determined that the fire's point of origin was in the living room. He then began the process of "delayering," which is the removal of debris layer by layer to determine the origin of the fire as well as the course taken by the fire as it progressed. Centracchio testified at trial that wherever possible "delayering" is conducted prior to the "overhaul" process because overhauling tends to disturb the layers of debris, making it more difficult to reconstruct

the cause and progression of the fire. After examining the debris, Centracchio ruled out the possibility that the fire was accidental in origin. He then seized samples from the living room and sent them to the University of Rhode Island Crime Lab, where tests confirmed his suspicion that the samples contained an unusually high amount of alcohol.

Subsequently, Moretti was indicted and charged with one count of first-degree arson, a violation of G.L.1956 (1981 Reenactment) § 11–4–2, as amended by P.L. 1983, ch. 185, § 1. After a jury trial a guilty verdict was returned on September 21, 1984. He was later sentenced to ten years' imprisonment at the Adult Correctional Institutions.

According to Centracchio, upon his arrival at the fire's scene he observed that the fire was basically under control. He remained there until 10 p.m., during which time he conducted an inspection of the interior and exterior of the premises and learned that ordinarily the first floor of the dwelling was occupied by Moretti and that the second was occupied by another individual and his eight-year-old daughter. Entering the first-floor apartment through the living-room door, Centracchio first observed a significant amount of charring, particularly on the floor of the living room. He also noted an overstuffed couch located on a braided rug and he noted charring in this area.

Centracchio told the jury that fire normally burns upward and outward, so when he observed horizontal charring across the living-room-floor surface, he saw this as an indication that a flammable liquid used to spread fire, an accelerant, was present in the area. This belief had additional support because of the existence of fire damage even in those corners of the room's floor that were not level, the normal situation being that the area of the floor burned during a similar blaze absent an accelerant

is less extensive. More charring was found in the narrow area between the bottom of the couch and the rug's surface, an area, according to Centracchio, that is usually safe from charring. This condition was a further indication of the use of an accelerant.[1]

During his inspection of Moretti's premises, Centracchio determined that the point of origin of the fire had been the "couch area of the living room," from under and in front of the couch where the rug and floor came together. He took samples from the kitchen linoleum, the couch, the rug, the wooden leg of the couch, and a leather, straw-filled hassock. He forwarded the samples to the university's laboratory and asked that a determination be made as to whether any flammable liquid was present in the materials. In due course, the laboratory furnished a written report to Centracchio indicating that "light volatile hydrocarbons in the classification of alcohols" were present in the rug and hassock. This report was later admitted in full at Moretti's trial during the direct examination of Dennis Hillard, the senior chemist at the laboratory.

Moretti's suppression motion was based upon the seminal United States Supreme Court cases dealing with the warrantless searching of a burned building by fire-inspection personnel, *Michigan v. Tyler*, 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978), and *Michigan v. Clifford*, 464 U.S. 287, 104 S.Ct. 641, 78 L.Ed.2d 477 (1984), a more recent plurality opinion.

Except in special situations, the entry into a home to conduct a search is unreasonable under the Fourth Amendment unless done pursuant to a warrant. *Steagald v. United States*, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981); *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Exigent circumstances, however, often require that a warrantless search be undertaken.[2] A fire-

1. Other observations of Centracchio led him to believe an accelerant was present. He observed that the couch's coiled metal springs were intact and unmelted, despite the existence of extensive fire damage to the body of the couch. He also observed unusual burning patterns in the linoleum, which pointed toward the presence of an accelerant.

2. *See, e.g., Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) (police in hot

damaged building presents such an exigency; therefore, a firefighter does not need a warrant to enter a building to fight a fire. The law presumes that the warrantless entry of a burning building is reasonable and therefore also permits firefighters to seize evidence of arson in plain view as well as investigate the cause and origin of the fire. *Michigan v. Tyler, supra.* As the Supreme Court held in *Tyler*, "officials need no warrant to remain in a building for a reasonable time to investigate the cause of a blaze after it has been extinguished. And if the warrantless entry to put out the fire and determine its cause is constitutional, the warrantless seizure of evidence while inspecting the premises for these purposes also is constitutional." 436 U.S. at 510, 98 S.Ct. at 1950, 56 L.Ed.2d at 499.

The Supreme Court did, however, in *Tyler*, invalidate subsequent warrantless searches that were clearly detached from the initial exigency and warrantless entry and not merely a continuation of the properly initiated investigation. *Id.* at 511, 98 S.Ct. at 1951, 56 L.Ed.2d at 499. In *Tyler* the invalidated searches consisted of searches of the premises that took place a number of weeks after the original searches.

■ In *Michigan v. Clifford*, the Supreme Court attempted "to clarify doubt" that existed after the *Tyler* decision. *Clifford*, 464 U.S. at 289, 104 S.Ct. at 645, 78 L.Ed.2d at 481. In a plurality opinion, Justice Powell wrote that whether a warrantless and nonconsensual entry onto a fire-damaged premises is constitutional turns on three factors: (1) whether there are legitimate privacy interests in the fire-damaged property that are protected by the Fourth Amendment, (2) whether there are exigent circumstances that justify the governmental intrusion regardless of any reasonable expectation of privacy, and (3) whether the object of the search is to determine the cause of the fire or to gather evidence of criminal activity. *Id.* at 292, 104 S.Ct. at 646, 78 L.Ed.2d at 483. We must therefore apply these factors to determine whether the warrantless search and seizure conducted in this case passed constitutional muster.

Turning to the first factor, the Supreme Court has recognized "that reasonable privacy expectations may remain in fire-damaged premises." *Id.* at 292, 104 S.Ct. at 646, 78 L.Ed.2d at 483. The test is objective: Whether "the expectation [is] one that society is prepared to recognize as 'reasonable,'" *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576, 587–88 (1967) (Harlan, J., concurring), and the "expectations will vary with the type of property, the amount of fire damage, the prior and continued use of the premises, and in some cases the owner's efforts to secure it against intruders." *Clifford*, 464 U.S. at 292, 104 S.Ct. at 646, 78 L.Ed.2d at 483. "If reasonable privacy interests remain in the fire-damaged property, the warrant requirement applies, and any official entry must be made pursuant to a warrant in the absence of consent or exigent circumstances." *Id.* at 292–93, 104 S.Ct. at 646, 78 L.Ed.2d at 483.

In *Clifford* the Court found that the Cliffords retained a reasonable expectation of privacy in their fire-damaged residence. Large portions of the Clifford home were undamaged by the fire, and the Cliffords had taken measures to secure the house against invasion, indeed boarding up their burned-out residence. *Id.* at 296–97, 104 S.Ct. at 648, 78 L.Ed.2d at 486. In the present case, the state accurately points out that Centracchio entered Moretti's home while the exigency, presenting a likelihood of the fire's rekindling, remained. Additionally, Moretti himself called the telephone operator to summon the firefighters, unlike the defendants in *Clifford* who had taken measures to secure their home. No privacy interest can be said to have been retained by Moretti while Inspector Centracchio did his work.

Turning to the second factor, the United States Supreme Court has recognized that a "burning building clearly presents an exigency of sufficient proportions to render a

---

pursuit of suspect enter house without warrant); *Ker v. California*, 374 U.S. 23, 83 S.Ct. 1623, 10

L.Ed.2d 726 (1963) (police enter dwelling without warrant to prevent destruction of evidence).

warrantless entry 'reasonable.'" *Tyler*, 436 U.S. at 509, 98 S.Ct. at 1950, 56 L.Ed.2d at 498. Once in the building for the purpose of extinguishing the blaze, firefighters may seize evidence of arson in plain view. *Id.* (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 465–66, 91 S.Ct. 2022, 2037–38, 29 L.Ed.2d 564, 582–83 (1971)). Moretti acknowledges the above-enunciated rules but contends that the subsequent case, *Michigan v. Clifford*, requires that once fire personnel determine that a blaze is of suspicious origin and are seeking evidence of criminal activity, they must obtain a search warrant after a showing of probable cause.

Moretti misstates the rule enunciated in *Clifford*. The Court in *Clifford* clearly acknowledged *Tyler*, holding that "once in [a] building, [fire] officials need no warrant to *remain* for 'a reasonable time to investigate the cause of a blaze after it has been extinguished,'" *Clifford*, 464 U.S. at 293, 104 S.Ct. at 646–47, 78 L.Ed.2d at 483–84 (quoting *Tyler*, 436 U.S. at 510, 98 S.Ct. at 1950, 56 L.Ed.2d at 486) and went on to observe that "[w]here, however, reasonable expectations of privacy remain in the fire-damaged property, *additional investigations begun after* the fire has been extinguished and fire and police *officials have left the scene*, generally must be made pursuant to a warrant or the identification of some new exigency." (Emphasis added.) *Clifford*, 464 U.S. at 293, 104 S.Ct. at 647, 78 L.Ed.2d at 484.

The rule recognizes the reality of the situation faced every day by trained, governmental fire inspectors. "The aftermath of a fire often presents exigencies that will not tolerate the delay necessary to obtain a warrant or to secure the owner's consent to inspect fire-damaged premises." *Id.* The "immediate threat that the blaze might rekindle presents an exigency that would justify a warrantless and nonconsensual post-fire investigation." *Clifford*, 464 U.S. at 293 n. 4, 104 S.Ct. at 647 n. 4, 78 L.Ed.2d at 484 n. 4. This rationale also holds true when a likelihood exists that evidence may be destroyed, intentionally or accidentally. *Id.*

Moretti's plight presents us with a situation within the exigency exception referred to both in *Clifford* and in *Tyler*. Centracchio arrived on the scene as the fire was being extinguished and he immediately began to do his job, which is to investigate and determine the cause of the fire. No officials had "left the scene"; indeed, it was the first and not an "additional" investigation into the fire's origin. Additionally, the fire-damaged premises were awaiting "overhaul" when Centracchio conducted his inspection. During the overhaul process the fire-suppression team searches for "hidden sparks of burning material which may cause rekindling," and in the process could destroy critical evidence. As such, Centracchio needed no warrant to enter the building, and he had a right, indeed a duty, to investigate the cause of the fire for a reasonable time after it was extinguished and to seize any relevant evidence in plain view.

Finally, it cannot be said that Centracchio was searching for evidence of a crime rather than evidence of the fire's origin. In *Clifford*, a crockpot and timer, found by fire inspectors in the basement of the burned structure and later determined by the inspectors to be the source of ignition, were admitted into evidence at trial. *Clifford*, 464 U.S. at 298–99, 104 S.Ct. at 649, 78 L.Ed.2d at 487. The Supreme Court held, however, that because the Cliffords had taken measures to secure their home after the fire was extinguished, and thus had retained significant privacy interests in their home, the basement search was unconstitutional. *Id.* at 295, 104 S.Ct. at 648, 78 L.Ed.2d at 485. The crockpot and timer, therefore, were excluded. *Id.* at 299, 104 S.Ct. at 649, 78 L.Ed.2d at 487. The Court held further that even assuming the basement search was valid, the subsequent search of the upper portions of the residence, conducted in the absence of an exigency, was unconstitutional "[b]ecause the cause of the fire was then known," and therefore could only have been a search for criminal activity. *Id.* at 297, 104 S.Ct. at 649, 78 L.Ed.2d at 486. The Court stressed that "[t]he scope of [a valid search] is limited to that reasonably necessary to deter-

mine the cause and origin of a fire and to ensure rekindling." *Id.* In this case, Centracchio was conducting a routine search into the cause and origin of the fire when he confirmed the likely presence of an accelerant. Moretti claims that because the inspector "early on" concluded that an accelerant was obviously present, his search for evidence of the fire's origin constituted a search for evidence of criminal activity.

▆ The Supreme Court did hold in *Clifford* that the "object of the search is important *even if* exigent circumstances exist," (emphasis added), *Clifford*, 464 U.S. at 294, 104 S.Ct. at 647, 78 L.Ed.2d at 484, and that "[c]ircumstances that justify a warrantless search for the cause of a fire may not justify a search to gather evidence of criminal activity once that cause has been determined." *Id.* at 294, 104 S.Ct. at 647, 78 L.Ed.2d at 484–85. But this statement does not mean that evidence of arson that is in plain view at the time of the search for the fire's origin may not be seized. The Court made it clear in *Clifford* that a search must be made pursuant to a criminal warrant, based upon a traditional showing of probable cause, when the evidence to be seized is *not in plain view. Id.* at 294–95, 104 S.Ct. at 647, 78 L.Ed.2d at 485. Here, all the evidence subjected to laboratory inspection was in plain view. It was right in front of Centracchio when he entered the living room and detected the presence of an accelerant. Therefore, he was not in error to seize the suspicious items before him.

Having applied the three factors enunciated in *Clifford*, it is apparent that the trial justice did not err in denying Moretti's motion to suppress the evidence seized in Moretti's apartment on the grounds that the search and seizure violated the rules enunciated in *Clifford* and *Tyler*.

▆ Moretti also contends that the laboratory testing, undertaken without a warrant, was illegal. Moretti cites *State v. von Bulow*, 475 A.2d 995 (R.I.1984), where we held that the chemical testing of pills owned by the defendant, procured without a warrant, was unconstitutional where the pills came into the possession of the police from a private party, and *State v. Eiseman*, 461 A.2d 369 (R.I.1983), where we held that absent exigent circumstances, a warrant is required to test the contents of any package seized by a private citizen and given to police when such police-testing constitutes a significant expansion of the private search.

The present case does not involve, as *von Bulow* and *Eiseman* did, an unconstitutional expansion of a *private* search. This case involves the testing, by *public* officials, of objects that came into their possession during a search that was valid despite the lack of a warrant. Moretti contends that this distinction is legally irrelevant, arguing that the fact "that the seized items in both *von Bulow* and *Eiseman* were turned over by private parties is relevant only insofar as that was the method by which the police came into lawful possession of the drugs." But a review of *von Bulow* reveals that the distinction is far from irrelevant.

In *von Bulow*, we stressed that "the Government may not exceed the scope of [a] private search unless it has the right to make an independent search." 475 A.2d at 1018 (quoting *Walter v. United States*, 447 U.S. 649, 657, 100 S.Ct. 2395, 2402, 65 L.Ed.2d 410, 418 (1980)). Even after a private citizen provides police with objects obtained in a private search, this does not "strip the remaining unfrustrated portion of that expectation of all Fourth Amendment protection." *Id.* (quoting *Walter*, 447 U.S. at 659, 100 S.Ct. at 2403, 65 L.Ed.2d at 419). We found an unconstitutional significant expansion of a private search in *von Bulow* when the state employed chemical means to reveal the hidden nature of the objects. *Id.* The state's testing constituted a significant intrusion upon the defendant's privacy "because, without it, the initial view of the objects tested produced only an inference of criminal conduct" by the defendant. *Id.* The positive identification of the objects achieved by the testing was "necessary in order to obtain the evidence which was to be used at trial," and therefore was an independent search subject to the Fourth Amendment. *Id.* (quot-

ing *Walter,* 447 U.S. at 654, 100 S.Ct. at 2400, 65 L.Ed.2d at 416).

The significant expansion cases, *von Bulow, Walter,* and *United States v. Jacobsen,* 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984), recognize that remaining interests in privacy can exist when objects are seized during private searches and then given to law enforcement officials. We do not, however, recognize remaining privacy interests in objects seized pursuant to a validly executed warrant, nor do we see reason to recognize remaining privacy interests in objects seized during a warrantless search that is completely valid because of some recognized exception to the warrant requirement. The United States Supreme Court, in *Tyler,* said it all when it pointed out that "officials need no warrant to remain in a building for a reasonable time to investigate the cause of a blaze after it has been extinguished. And if the warrantless entry to put out the fire and determine its cause is constitutional, the warrantless seizure of evidence while inspecting the premises for these purposes also is constitutional." *Tyler,* 436 U.S. at 510, 98 S.Ct. at 1950, 56 L.Ed.2d at 499. No principle of constitutional law requires any law enforcement official to obtain a warrant prior to testing any item seized during a valid search. To hold otherwise in this case would be effectively to neutralize the power of the governmental fire inspector, who is expected by his or her employer to determine the cause and origin of fires occurring within the inspector's area of responsibility and to prevent them in the future.

We turn now to the prior-convictions issue. Before his trial, Moretti filed a motion in limine, seeking a ruling whether the state would be entitled to impeach him with four prior misdemeanor convictions when he testified at his 1984 trial. The convictions to be used by the state were a 1976 conviction for possession of marijuana, a 1980 conviction for disorderly conduct, a 1980 conviction for possession of a dangerous weapon (a knife), and a 1980 conviction for obstructing a police officer. After lengthy argument before the trial justice,

the defendant's motion to exclude the convictions was denied.

The thrust of Moretti's testimony was that he had, on various occasions, given his wife alcohol rubs while she lay on the couch, and that he had spilled alcoholic drinks in the area, thus accounting for the presence of alcohol. When Moretti testified in his own defense, evidence of the four convictions was offered by the state and admitted by the court during the state's cross-examination. Upon their admission, the trial justice instructed the jury that the evidence of the prior convictions was to be received for the sole purpose of assessing Moretti's credibility.

Moretti's challenge to the use of these prior convictions to impeach his testimony is twofold. First, Moretti challenges their use on the grounds that he was not represented by counsel at the time the convictions were obtained. Second, Moretti claims that the misdemeanor convictions should be used to impeach testimony only when those convictions go to truth and veracity.

In *Loper v. Beto,* 405 U.S. 473, 92 S.Ct. 1014, 31 L.Ed.2d 374 (1972), the United States Supreme Court held that prior convictions may not be used to impeach the credibility of a criminal defendant when those prior convictions were constitutionally invalid because the defendant was denied the assistance of counsel. The policy behind the prohibition was clear: "The absence of counsel impairs the reliability of such convictions just as much when used to impeach as when used as direct proof of guilt." *Id.* at 483, 92 S.Ct. at 1019, 31 L.Ed.2d at 382 (quoting *Gilday v. Scafati,* 428 F.2d 1027, 1029 (1st Cir.1970)).

In *Scott v. Illinois,* 440 U.S. 367, 373–74, 99 S.Ct. 1158, 1162, 59 L.Ed.2d 383, 389 (1979), the United States Supreme Court held that "the Sixth and Fourteenth Amendments to the United States Constitution require only that no indigent criminal defendant be sentenced to a term of imprisonment unless the State has afforded him the right to assistance of appointed counsel in his defense." A state trial court need not appoint counsel for a criminal defend-

ant, however, when the defendant is charged with a statutory criminal offense for which punishment by imprisonment upon conviction is authorized but not in fact imposed. *Id.* In other words, the trial justice, under federal constitutional law, may make a determination prior to trial that no sentence of imprisonment will be imposed if a conviction is obtained and then deny a defendant courtappointed counsel.

 The Rhode Island constitutional guarantee of appointed counsel is broader than the federal guarantee espoused in *Loper v. Beto.* In *State v. Holliday,* 109 R.I. 93, 280 A.2d 333 (1971), this court declared that art. I, sec. 10, of the Rhode Island Constitution requires that counsel be appointed to indigents charged with the commission of a misdemeanor, absent an intelligent waiver. The right to the assistance of state-furnished counsel was limited, however, to those being tried for offenses wherein imprisonment of more than six months could be imposed. *Id.* at 99–100, 280 A.2d at 337. The confluence of the federal and the state guarantees is if an indigent Rhode Island criminal defendant faces a potential sentence of more than six months, Rhode Island constitutional law guarantees to a defendant appointed counsel, even if the trial justice predetermines that no prison sentence will be imposed. If the potential sentence is less than six months, federal constitutional law guarantees the defendant appointed counsel unless the trial justice predetermines that no prison sentence will be imposed.

 Moretti contends that he was not represented by counsel at any of the four hearings in the Rhode Island District Court that resulted in the four misdemeanor convictions used to impeach him at his trial for arson. Counsel for Moretti conceded that Moretti could not remember whether he was advised by the District Court judge of his right to counsel, nor could he remember whether he made a knowing and intelligent

waiver of that right. Nevertheless, counsel contends that as a matter of general practice, Rhode Island District Court judges routinely advise defendants that they have no right to counsel when and if the judge has predetermined that no prison sentence will be imposed if a conviction results. Such a practice would be permissible under federal constitutional law but impermissible under Rhode Island constitutional law, regardless of the judge's intent, whenever the *potential* sentence is more than six months.

One year after the United States Supreme Court's holding in *Loper v. Beto,* this court held that a predicate to the invocation of the rule in *Loper* prohibiting the record of an uncounseled prior conviction to impeach credibility was a "showing by the witness that he was not represented by counsel at the time of the entry of his past convictions." *State v. Palmigiano,* 112 R.I. 348, 357, 309 A.2d 855, 860 (1973). Indeed, we held that "a positive representation" by the witness is required to invoke the prohibition. *Id.* While counsel for Moretti accurately points out that the District Court does not maintain a stenographic record of all proceedings, making it difficult for defendant to make a "positive representation" that he was unlawfully denied counsel at his misdemeanor trials, we are nevertheless unwilling to hold that the bare assertion by a defendant that he or she was denied assistance of counsel, or, that he or she cannot recall whether he or she was, is sufficient to satisfy the requirement that a showing be made by the defendant that he or she was tried unwillingly without an attorney.[3] Among the options available to a defendant faced with such a circumstance would be to call a witness who was present at the hearing at which the District Court judge impermissibly denied the defendant counsel, or, the defendant might offer evidence of a timely but unsuccessful appeal

---

**3.** In *State v. Bennett,* 122 R.I. 276, 405 A.2d 1181 (1979), a defendant successfully challenged a trial justice's refusal to rule in limine whether the state would be entitled to impeach the defendant, were he to decide to testify, with certain prior convictions. When the defendant also claimed that he also could not recall whether he was represented by counsel when the prior convictions were obtained, we reemphasized our requirement that a positive showing of nonrepresentation be made when raising that issue. *Id.* at 278 n. 2, 405 A.2d at 1182 n. 2.

of such an unlawful conviction.[4] In any case, were this court to hold that a defendant's bare assertion that he was impermissibly denied counsel, or, as in this case, an assertion that he cannot recall whether he was impermissibly denied counsel, is sufficient to prevent the use of prior convictions to impeach, this might encourage defendants/witnesses to make such claims regardless of their truth and effectively neutralize the intent of the Legislature that such prior misdemeanor convictions be admissible for impeachment purposes. Accordingly, we reject this phase of Moretti's appeal.

Moretti also claims that the four misdemeanor convictions used to impeach his credibility should not have been allowed before the jury because none of the prior crimes had a direct bearing on his veracity. In *Ciravolo v. United States*, 384 F.2d 54 (1st Cir.1967), the First Circuit Court of Appeals held that as a matter of federal law a witness's credibility could not be impeached by the admission of any prior conviction unless the particular offense had a direct bearing on truth or veracity. Moretti urges us to adopt such a rule.

 In Rhode Island the right to impeach a witness's credibility by showing prior convictions is statutory. *Palmigiano*, 112 R.I. at 356, 309 A.2d at 860; G.L.1956 (1985 Reenactment) § 9–17–15. The practice in Rhode Island is that a witness may be impeached by evidence of a prior conviction, regardless of the possible prejudice or of whether the conviction was for a crime involving dishonesty or false statement. *State v. Aptt*, 441 A.2d 824, 828 (R.I.1982); *State v. Lombardi*, 113 R.I. 206, 208, 319 A.2d 346, 347 (1974). When the defendant in *Palmigiano* made the similar argument, to wit, that the prejudicial effect of offering prior crimes to impeach renders their use unfair, we pointed out that despite Palmigiano's "excellent" compendium of cases and arguments against the Rhode Island rule, changes in the rule "should originate in the state

house, not the courthouse." *Palmigiano*, 112 R.I. at 356, 309 A.2d at 860. Section 9–17–15 today states that a "conviction or sentence for any crime or misdemeanor may be shown to affect [a witness's] credibility," and therefore, it is still the law of our state, as intended by the Legislature. It is not our place to reverse our stance now and declare the rule void. Thus, we decline to adopt the rule of the First Circuit requiring that prior convictions concern dishonesty or false statement if they are to be used to impeach a witness.

Moretti's appeal is denied and dismissed, and the judgment of conviction appealed from is affirmed.

---

4. In the past we have emphasized that when a conviction in District Court is appealed to Superior Court, the appeal automatically vacates the conviction in the District Court; and pending such appeal, the conviction in the District Court cannot be used for impeachment purposes under this section. *State v. Roderick*, 121 R.I. 896, 403 A.2d 1090 (1979).