STATE

v.

**John James TARVIS and Thomas M. Porraro.**

No. 82–202–C.A.

Supreme Court of Rhode Island.

Aug. 30, 1983.

Dennis J. Roberts II, Atty. Gen., Anthony DelBonis, Sp. Asst. Atty. Gen., for plaintiff.

William F. Reilly, Public Defender, Providence, for Tarvis.

Barbara Hurst, Chief Appellate Atty., Janice R. Weisfeld, Asst. Public Defender, Daniel A. Procaccini, Providence, for Porraro.

## OPINION

WEISBERGER, Justice.

This is an appeal from judgments of conviction in the Superior Court for first-degree murder and other violent crimes, enumerated below. On appeal the defendants set forth a multiplicity of errors that they attribute to the trial justice and assert as the basis for reversal of their convictions.

The facts as disclosed by the record are as follows.

The unfortunate events that underlie the convictions that are being challenged in this case occurred on November 18, 1980. The defendants, Thomas M. Porraro (Porraro) and John J. Tarvis (Tarvis), were drinking and playing pool at the Bonefero Club, which is located on Salmon Street near the Manton Avenue housing development in Providence. Porraro became involved in an argument with Jody Petrarca (Jody), who had been accompanied to the club by Bruce R. Ottiano (Bruce). Eventually, a fight erupted between Jody and Porraro. The altercation spilled into the hallway and then out onto the street. Although Tarvis, Bruce, and Porraro's brother-in-law were present, the record does not clearly reflect who, if any, of the men, other than Jody and Porraro, actively participated in the fight. In any event, Jody prevailed, the fight ended, and Jody and Bruce started to leave the scene after Bruce retrieved an article of clothing that Jody had left behind.

As Jody and Bruce walked away, Tarvis and Porraro moved the car that Tarvis had been driving from the side parking lot to the street in front of the club. Tarvis emerged from the car carrying a rifle and fired it twice in the direction of Jody and Bruce, who quickly fled to a point near Bruce's residence at 470D Manton Avenue. They then parted; Jody went to a friend's house, and Bruce went to the apartment of his sister, Gail C. Ottiano (Gail), at 479 Manton Avenue. Bruce stayed at Gail's briefly, then went to Caesar's Bar before returning to his parents' home.

At some point after Bruce had left his sister's apartment, Porraro and Tarvis arrived. They rang Gail's doorbell, and she responded so far as to descend the stairs to the single glass door that separated the porch from the stairwell. Seeing that Porraro was carrying a weapon, Gail fled back up the stairs into her bedroom, with defendants close behind. Porraro pointed a gun at Gail and demanded to know where her

brother and his friends were. Gail asked Porraro why he wanted to find Bruce. Porraro replied that he was going to kill him.

In the meantime, Tarvis searched the apartment. Gail denied knowing her brother's whereabouts and pleaded with defendants to leave. Tarvis suggested to Porraro that he leave Gail alone because she knew nothing about the fight. Eventually defendants left the apartment. After reporting the incident to the police and her family, Gail went to her mother's apartment for the evening.

Porraro and Tarvis drove from Gail's apartment to the apartment on 272 Manton Avenue where Tarvis was then living with Deborah A. Pierro (Deborah). When defendants arrived at the apartment, Deborah, her sister, her brother-in-law, her nephew, and Paula Trofi (Porraro's wife), were present. Apparently, Porraro's face was swollen and covered with blood from injuries that he had suffered during the fight with Jody. Deborah testified that as Tarvis helped Porraro clean himself, Tarvis said that "[i]t's not worth it, you know." Porraro was not dissuaded, however, and replied that "I'll get him this time. All we're doing now is just shooting at the houses." Deborah then approached Tarvis to ask what was happening. Tarvis said that "[Porraro's] in trouble * * * and if he has to go to jail, I'll go with him * * *."

The defendants left the apartment but quickly returned with weapons and ammunition. Tarvis carried a rifle and Porraro brandished a handgun until Tarvis told him not to point it at anyone. Evidently the handgun was jammed so defendants went to another room to fix it. At about this time Roland E. Bourdeau (Bourdeau) came upon the scene. He and his brother had twice visited the apartment earlier that evening because Tarvis had been planning to give them a car battery. On the third visit, however, Bourdeau entered the apartment alone.

Porraro was upset and appeared to Bourdeau to be threatening him with the rifle. According to Bourdeau, Tarvis attempted to calm Porraro down and explained what had occurred at the Bonefero Club. Porraro interjected that whoever was responsible for his beating had to be "taken out of the box." Bourdeau interpreted this as an expression of Porraro's intention to kill someone. Tarvis reinforced this impression by saying to Bourdeau: "You know, Ron, they do that to one of the 'bros,' they got to go."

The defendants then enlisted Bourdeau's aid as their driver. The evidence indicates that the voluntariness of Bourdeau's assent to defendants' request was questionable at best. Bourdeau testified that he felt threatened by Porraro and agreed to drive defendants only after they assured him that they would not bring any weapons along and that they only wanted him to drive them to Porraro's house. Deborah, on the other hand, claimed that Bourdeau helped defendants fix the jammed pistol and that when Tarvis asked Bourdeau if he wanted to get involved, he replied, "Sure, why not?"

In any event, the trio left in Bourdeau's car after Porraro had escorted Deborah's sister, brother-in-law, and nephew to their car at gunpoint, had admonished them not to return, and had warned them not to call the police. Bourdeau first drove to his house to drop off his brother-in-law, who had been waiting for Bourdeau to come out of Tarvis's apartment. Bourdeau claimed that he then attempted to proceed to Porraro's house but that Porraro threatened him with a gun and ordered him instead to return to 272 Manton Avenue. Once there, Tarvis went inside to get the rifle.

After Tarvis returned, Bourdeau exited from the driveway and drove straight up Manton Avenue. At a point near the Ottiano residence at 470 Manton Avenue, defendants told Bourdeau to stop the car. They then began to fire out of the driver's window in the direction of the apartment located in that building. Bourdeau testified that Porraro said "that he lived right there in that end apartment indicating the * * * apartment."

Mr. Leonard J. Vitucci and Mrs. Ellen A. Vitucci, tenants at 470C Manton Avenue, testified that the sound of gunfire startled them and that they contacted the police. No bullets entered their apartment but several bullets entered the adjacent apartment (470B) where Mrs. Mary Wendolowski lived. Mrs. Wendolowski was uninjured during this attack.

The defendants then returned to Tarvis's apartment where, with some difficulty, Tarvis obtained more ammunition from Deborah. Bourdeau then drove defendants by a circuitous route back to the street in front of 470 Manton Avenue. Porraro fired the rifle out of the driver's-side window at the building, Bourdeau drove around the block, and Porraro again shot at the building, this time from the passenger's-side window. Bourdeau claimed that Tarvis did not participate in this part of Porraro's shooting activity.

Mr. Vitucci testified that as the car passed by 470 Manton Avenue, he was standing near the front door of his apartment. He accidentally hit a light switch, Bourdeau's car backed up, and a shot was fired at him. According to Mr. Vitucci, the bullet missed his apartment but entered Mrs. Wendolowski's apartment. It was later discovered that Mrs. Wendolowski was killed by this bullet. Bourdeau admits that he stopped the car momentarily while Porraro fired but denies that he ever backed up. In either event, the bullet that struck and killed Mrs. Wendolowski was fired sometime during defendants' second trip to 470 Manton Avenue.

The defendants returned briefly to Tarvis's apartment and were then pursued by a state trooper. During the chase, one of defendants threw the rifle from Bourdeau's car. They evaded the police and arrived at Porraro's Douglas Avenue apartment. Porraro left the pistol at the apartment. Deborah testified that the next day Paula Trofi placed the weapon in a tube sock and hid it on some railroad tracks. After they left Porraro's apartment, defendants drove to a nearby gas station where they left Bour-

deau's car. According to Bourdeau, both defendants threatened the safety of his wife and child while warning him not to report the evening's activities.

Eventually, police recovered the rifle and the handgun, and an investigation resulted in the arrest of both defendants. A ten-count indictment charged Porraro, Paula Trofi, Tarvis, and Bourdeau with various crimes arising from the events of November 18, 1980. Because Bourdeau testified for the state, the charges against him were dropped. The charge of harboring against Paula Trofi has not yet been prosecuted. We shall therefore delineate the other nine counts only as they relate to Porraro and Tarvis. The indictment jointly charged defendants as follows: count 1—the murder of Mary Wendolowski; count 2—an assault on Leonard J. Vitucci with a rifle; count 3—possession of a loaded rifle in a motor vehicle; count 4—an assault on Gail C. Ottiano in a dwelling house with intent to murder; count 5—an assault on Bruce R. Ottiano with a rifle; count 6—an assault on Jody Petrarca with a rifle; count 7—an assault on Robert W. Savitsky (Deborah Pierro's brother-in-law) with a pistol; and count 8—an assault on Robin M. Savitsky (Deborah's sister) with a pistol. In addition, count 9 charged Tarvis alone with possession of a rifle after a previous conviction of a crime of violence.

The defendants were tried jointly. A Superior Court jury found Porraro guilty on all counts against him. Tarvis was convicted on counts 1, 2, 3, 5, 6, and 9. Upon Tarvis's motion for a judgment of acquittal, the trial justice dismissed counts 7 and 8 and reduced the charge in count 4 from assault with intent to murder to assault with a dangerous weapon. The jury found Tarvis guilty of this crime.

On appeal, defendant Tarvis raises several issues and is joined in two of his contentions by defendant Porraro. Each defendant claims that the trial justice erred in (1) failing to instruct the jury on second-degree murder and involuntary manslaughter and instead issuing an instruction on first-de-

gree murder only, and (2) repeatedly denying their motions for severance. Porraro sets forth no other issues. Tarvis, on the other hand, further asserts the following: (1) the trial justice erred in denying his motion for a judgment of acquittal on the counts charging murder and assault with a dangerous weapon; (2) even if the trial justice's rulings on the motion for a judgment of acquittal were correct, he should have granted Tarvis's motion for a new trial regarding these counts; (3) the trial justice erred in refusing to dismiss the indictment because Tarvis's right to a speedy trial had been impinged; and (4) the cumulation of errors violated Tarvis's right to a fair trial and due process and therefore warrants reversal. We shall address these points in the order in which we have set forth each contention. First, however, we shall determine the merits of the two issues that are common to the appeal of both defendants.

I

*The Joint Appeal of Tarvis and Porraro*

A. *Jury Instructions*

The indictment charged defendants with murder in violation of G.L. 1956 (1969 Reenactment) § 11–23–1, which defines murder as "[t]he unlawful killing of a human being with malice aforethought."[1] Further, the statute provides:

"Every murder perpetrated by poison, lying in wait, or any other kind of wilful, deliberate, malicious and premeditated killing * * * or perpetrated from a premeditated design unlawfully and mali-

ciously to effect the death of any human being * * * is murder in the first degree. Any other murder is murder in the second degree." *Id.*

The murder statute empowers the jury to utilize the provisions of § 12–17–14 to find a defendant guilty of a lesser degree of murder or any lesser included offense if the jurors find that the state has not demonstrated that defendants committed the charged offense.

In addition to instructions on first-degree murder, defendants requested that the trial justice instruct the jury that the length of premeditation is the primary difference between first- and second-degree murder. The defendant further requested instructions on the elements of voluntary and involuntary manslaughter. The trial justice, however, instructed the jury that

"[s]ometimes in a case where the state brings a charge of murder, the judge has to spend some time talking about second degree murder and manslaughter. That is not the case here. This is a case of first degree murder where the verdict will be either guilty or not guilty as to each defendant."

Counsel for both defendants voiced timely objections to the trial justice's omission of the requested instructions concerning the difference between first- and second-degree murder and the elements of voluntary and involuntary manslaughter. On appeal, therefore, defendants might contend that the trial justice erred in refusing to grant these instructions. *See* Super.R.Crim.P. 30.[2]

---

1. General Laws 1956 (1969 Reenactment) § 11–23–1 has been superseded by G.L.1956 (1981 Reenactment) § 11–23–1. The current version of the statute, however, is in all relevant aspects nearly identical to the version of the statute in force at the time of defendants' trial. For the sake of consistency and clarity, therefore, we refer to the statute as reenacted in 1969 as if it were currently effective.

2. Before we address defendant's contentions, we note that the state tried Porraro as a principal and Tarvis as an aider and abettor. Both defendants requested identical instructions and

objected to the trial justice's omission of the same instruction. The trial justice instructed the jury in a manner that was consistent with the state's theory. On appeal, both defendants raise the same issues regarding the instructions. Furthermore, defendant Tarvis's challenge to the jury instructions includes, in part, the assertion that Porraro's conduct might have been unintentional. These factors compel us to hold that our determination of the jury-instruction issue applies equally to the appeal of both defendants.

In addition, we mention that appellate counsel has not challenged the trial justice's failure

The defendants now set forth two theories upon which the jury could have rationally found, on the basis of the evidence presented, that defendants were guilty of second-degree murder. These are (1) that assault with a dangerous weapon, as an inherently dangerous felony, could have served as the basis for a second-degree felony-murder conviction and (2) that defendants' actions were unintentional but were wanton and reckless and, as such, could have led the jury to convict defendants of second-degree murder. At trial, however, counsel for both defendants requested the following instruction in respect to second-degree murder:

> "Murder of the second degree results when there is an unlawful killing of a human being with malice aforethought but the conscious design or intent to kill existed for only a moment."

As we have indicated, the trial justice refused to grant the requested instruction, and both defendants voiced timely objections, thus preserving this point for appeal. The requested instruction contained nothing, however, regarding the theories of second-degree murder that defendants now assert to this court as the basis for a second-degree-murder instruction.

In *State v. Cole,* 121 R.I. 39, 394 A.2d 1344 (1978), the defendant completely failed at trial to request a particular instruction yet on appeal challenged the trial justice's omission of that instruction. We refused to consider Cole's argument on this point. *Id.* at 43, 394 A.2d at 1346. Unlike *Cole,* the case before us involves a situation in which defendants purported to comply with Rule 30 of the Superior Court Rules of Criminal Procedure. The problem we must confront, however, lies in the requested instruction's failure to articulate the theories that defendants now assert as the rationale for the granting of the instruction.

 This problem, however, is susceptible of swift resolution. This court has frequently held that if "a defendant has neither objected to a charge *on the ground urged on appeal* nor requested a different charge, the charge given becomes the law of the case." *State v. Collazo,* R.I., 446 A.2d 1006, 1012–13 (1982); *State v. Giordano,* R.I., 413 A.2d 93, 94 (1980). (Emphasis added.) The second-degree-murder instruction that defendant requested addressed the difference between first- and second-degree murder in respect to the length of premeditation. If trial counsel for defendants believed that the evidence warranted a second-degree-murder instruction because defendant acted in a wanton and reckless manner or in the course of an inherently dangerous felony, they should have requested specific instruction regarding these theories of second-degree murder.[3] As we pointed out in *State v. Cole, supra,* "Rule 30 of the Superior Court Rules of Criminal Procedure requires trial counsel to object to the charge as given and articulate the objections in such a fashion that the trial justice is made aware of the exact nature of his alleged error, be it of commission or omission." 121 R.I. at 42–43, 394 A.2d at 1346; *see State v. Williams,* R.I., 432 A.2d 667 (1981). A similar requirement of specificity is applicable to the requests for instructions. We hold that trial counsel's failure to make such requests precludes us from considering defendants' challenge to the trial justice's refusal to give a second-degree murder instruction.[4] *See, e.g., State*

---

to instruct the jury on voluntary manslaughter even though trial counsel requested such an instruction and objected to the trial justice's ruling in a timely fashion. We shall therefore decline to address the voluntary-manslaughter issue.

**3.** Appellate counsel for defendants and the state are not the same attorneys who tried the case. Nevertheless, we note that trial counsel's failure to request more specific second-degree-

murder instructions is clear from the record. Yet neither appellate counsel for defendants nor appellate counsel for the state mentioned this fact either in their briefs or during oral argument before this court.

**4.** It should be noted that defendants do not assert as error on appeal the failure of the trial justice to give an instruction on second-degree murder based on the length of premeditation, as originally requested.

v. *Collazo,* 446 A.2d at 1013; *State v. Giordano,* 413 A.2d at 94; *State v. Cole,* 121 R.I. at 43, 394 A.2d at 1346; Super.R.Crim.P. 30; *cf. State v. Romano,* R.I., 456 A.2d 746, 764–65 (1983) (objections to jury instructions and the rationale for such objections must be articulated in "clear and distinct language" at the time of trial); *State v. Vargas,* R.I., 420 A.2d 809, 815–16 (1980) (a defendant cannot challenge jury instructions on appeal unless the defendant objected to the charge as given). Consequently, we need only address defendants' contention that the trial justice erred in omitting from his jury instructions a delineation of the elements of involuntary manslaughter.

As we noted in *State v. Cline,* R.I., 405 A.2d 1192, 1204 (1979), this court "has long followed the doctrine that instructions should not be given on lesser degrees of murder or manslaughter unless there is evidence in the case to support such a finding * * *." Although defendants concede, for the sake of argument, that the evidence could have supported a finding of first-degree murder, they assert that it could have equally supported a finding of involuntary manslaughter. Accordingly, they contend that the trial justice should have instructed the jury on this lesser offense.

It is elementary that a defendant must have killed unintentionally to be guilty of involuntary manslaughter. *See State v. Vargas,* 420 A.2d at 815; LaFave & Scott, *Criminal Law* § 78 at 587 (1972). In the case before us, the crux of the state's case was that Porraro intended to kill Bruce Ottiano when he mistakenly shot Mary Wendolowski. Indeed, the evidence was overwhelming that Porraro formed such an intent soon after his defeat at the hands of Jody Petrarca.

Porraro expressed this intent to Bruce's sister, Gail, and then to Tarvis and Bourdeau. His actions in directing Bourdeau's driving of the car indicate that Porraro fired at the apartment in 470 Manton Avenue where he believed Bruce lived and was then present. In short, we are of the opinion that the evidence of intent to kill was such that the jury could not have rationally found defendants guilty of involuntary manslaughter. Accordingly, the trial justice properly denied defendants' request for a jury instruction on the elements of this crime.

## B. *Motions for Severance*

The defendants three times joined in motions for severance. Counsel for Tarvis first made such a motion prior to the start of testimony. He asserted that the theory of the state's case would necessitate that he "magnify everything that Thomas Porraro did and suggest to the jury that he should be found guilty of murder and not John J. Tarvis." Accordingly, Tarvis's attorney moved that his client be tried separately from Porraro, whose attorney joined in the motions.

Basing his opposition to the motion on a judicial-efficiency argument, the prosecutor asserted that any prejudice that might be caused by a joint trial could be mitigated by cautionary instructions to the jury. Apparently, the trial justice agreed. Relying on this court's recent decision in *State v. Gibbons,* R.I., 418 A.2d 830 (1980), he denied the motion to sever.

The defendants renewed the motion twice during the course of the trial. Counsel for Tarvis made the first renewal of the motion after he attempted to demonstrate during cross-examination of Gail Ottiano that only Porraro threatened Gail when defendants entered her apartment looking for her brother, Bruce. Porraro's attorney joined in the motion, but it was denied.

The second renewal occurred after Tarvis's attorney cross-examined Bourdeau regarding whether or not Tarvis ever threatened Bourdeau, actively participated in Porraro's vendetta, or encouraged Porraro's actions. Counsel for Porraro objected to the line of questioning, moved for severance, and was joined in the motion by counsel for Tarvis. Once again, the trial justice denied the motion.

Recently, in *State v. Clarke,* R.I., 448 A.2d 1208, 1209 (1982) and *State v. Gibbons,* 418 A.2d at 835, we reaffirmed the established principle that a defendant is not entitled to a severance as a matter of right and that the trial justice's ruling on a motion to sever lies within his or her sound discretion. In denying such a motion, the trial justice abuses his or her discretion only when the denial causes the defendant to "suffer prejudice sufficiently substantial to impinge upon his right to a fair trial." *State v. Patriarca,* 112 R.I. 14, 28, 308 A.2d 300, 310 (1973). We shall overturn a trial justice's denial of a motion to sever only upon a defendant's affirmative showing of such prejudice. *E.g., State v. Clarke,* 448 A.2d at 1209.

The defendants argue that separate trials were warranted because their defenses were antagonistic; Tarvis claims that the state's aiding and abetting theory caused him to point an accusatory finger at Porraro, who contends that he was therefore forced to fend off the attacks of both the prosecutor and defendant. Consequently, both defendants assert that the trial justice's denial of the motions to sever deprived them of their constitutionally guaranteed right to a fair trial.

Indeed, this court has recognized that the antagonistic defenses of codefendants in a joint trial may warrant severance "if the conflict * * * is real and substantial and of such an irreconcilable nature that it is likely the jury will infer guilt on the basis of the conflict alone." *State v. Clarke,* 448 A.2d at 1209; *State v. Gibbons,* 418 A.2d at 835. Perhaps the most obvious example of such a conflict between defenses arises when both the prosecutor and a codefendant attack the defendant. *See, e.g., State v. Thibodeaux,* 315 So.2d 769, 771 (La.1975); *State v. Clarke,* 448 A.2d at 1209–10.

In *State v. Clarke, supra,* three defendants were tried jointly for the ice-pick murder of a man who had requested that one of the defendants remove two automobiles from his property. The evidence indicated that all three defendants had attacked the victim but that only one defendant held an ice pick during the fight. During the trial, one defendant took the stand in his own defense, denied participation in the altercation, and claimed to have seen Clarke stab the victim several times with the ice pick. Clarke, however, never testified in his own defense. Nevertheless, the trial justice denied the defendant's motion for severance, which, like the motion in this case, was made in the form of a renewal motion after damaging testimony. We reversed.

As Tarvis's reliance upon *Clarke* indicates, the facts of that case superficially resemble those that gave rise to this appeal. This similarity evaporates, however, when examined in the light of the difference between the two cases in respect to the facts and the legal theories upon which the state based its prosecution.

First of all, Tarvis, unlike Clarke's codefendant, elected to exercise his constitutional right not to testify instead of taking the stand to assert his noninvolvement in the shooting spree. Moreover, the cross-examination of Bourdeau and Gail Ottiano that Tarvis's counsel conducted indicates that he intended to assert that Tarvis was just along for the ride. In *Clarke,* on the other hand, the codefendant who testified claimed that he could not be held responsible for the stabbing because he was not within striking range of the victim when the victim was fatally stabbed.

Furthermore, the codefendant in *Clarke* testified to rebut the direct testimony of a prosecution witness that the testifying codefendant was present at the scene and held an ice pick. In this case, no one testified that Tarvis, rather than Porraro, fired the shot that killed Mary Wendolowski. Indeed, the testimony of prosecution witness Bourdeau and the state's ballistics evidence both support the proposition that Porraro, not Tarvis, fired the fatal shot during defendants' second attack on 470 Manton Avenue.

This last factual distinction reveals, in fact, the fatal flaw in defendants' argu-

ment that their defenses were antagonistic. In *Clarke,* the state clearly believed that the defendant who ultimately testified was the person who stabbed the victim, yet it charged all three defendants with murder under a joint-enterprise theory. In this case, on the other hand, the state charged Porraro as the principal and Tarvis as the aider and abettor. This theory explains why the state never contended that Tarvis was the principal criminal actor. By claiming that a defense of "just along for the ride" exculpated Tarvis in a manner antagonistic to Porraro's interests, counsel for Tarvis misinterprets the state's theory. Whether or not Tarvis actually verbally threatened Bourdeau, drew a weapon on Gail Ottiano, fired the shot that killed Mary Wendolowski, or physically participated in any of the criminal actions with which he and Porraro were charged, he could still be held responsible as an aider and abbettor to Porraro's criminal actions. LaFave & Scott, § 64 at 502–03; *see State v. Gazerro,* R.I., 420 A.2d 816, 828–29 (1980). Moreover, Porraro could be found guilty as a principal regardless of Tarvis's passivity.

Furthermore, the cross-examination of Bourdeau and Gail Ottiano in which they testified that only Porraro threatened them served only to buttress the testimony that they gave on direct examination. Although this testimony certainly reinforced the state's case against Porraro, it did not concurrently weaken the state's charge that Tarvis aided and abetted Porraro's actions. In addition, the trial justice quoted extensively from *State v. Gazerro, supra,* when he instructed the jury that Tarvis's presence at the scene of the various crimes, in and of itself, was insufficient to warrant conviction of Tarvis as an aider and abettor. This instruction properly lessened the possibility, as argued by Tarvis on appeal, that the jury would find Tarvis guilty solely because of "the inevitable rub-off of Porraro's guilt upon him." Accordingly, we find that the trial justice properly denied Tarvis's motion for severance. Similarly, we are of the opinion that the joint trial in no way impinged upon Porraro's right to a fair trial.

## II

### *Tarvis's Appeal*

A. *Motion for Judgments of Acquittal and for a New Trial*

After the state rested its case, Tarvis moved for judgments of acquittal on charges that he assaulted various people with dangerous weapons and murdered Mary Wendolowski. The trial justice granted the motion only in respect to the two counts that charged Tarvis with assaulting Deborah Pierro's sister and brother-in-law. He granted the motion that addressed the charge that Tarvis assaulted Gail Ottiano with an intent to murder her, but only to the extent of reducing the charge to assault with a dangerous weapon. After the defense rested without presenting any evidence, Tarvis renewed his motions. The trial justice, however, again denied the motion; the jury convicted Tarvis on all charges that were submitted to it, and Tarvis moved for a new trial on these charges. This request was denied and on appeal Tarvis challenges the trial justice's denial of his motions for judgments of acquittal and for a new trial.

We are of the opinion that the trial justice properly denied Tarvis's motions for judgments of acquittal. As our recital of the facts indicates, when viewing the state's evidence in the light most favorable to the state, drawing all reasonable inferences consistent with guilt, and not considering witness credibility or evidentiary weight, the trial justice could properly determine that the evidence was sufficient to submit the case to the jury on all charges against Tarvis. *See, e.g., State v. Lillibridge,* R.I., 454 A.2d 237, 239 (1982); *State v. Dionne,* R.I., 442 A.2d 876, 883 (1982). There was overwhelming evidence that Tarvis did more than sit idly by while Porraro committed the assaults and the murder and that Tarvis shared in Porraro's criminal intent. The trial justice, therefore, was cor-

rect in allowing the jury to decide whether or not Tarvis aided and abetted Porraro's criminal activity.

 Similarly, we find that the trial justice was correct in denying Tarvis's motion for a new trial. As we recently held in *State v. Romano, supra,* the standard that the trial justice applies when addressing a new-trial motion is much different from the standard applied to an acquittal motion. Specifically, "the trial justice considers all the evidence, weighs it, takes into account the credibility of witnesses, and considers the evidence in light of the charge given to the jury." *Romano,* 456 A.2d at 762. The trial justice should articulate the facts upon which he or she granted or denied the motion for a new trial, and this court will not disturb the ruling unless the trial justice misconceived material evidence or was otherwise clearly wrong. *Id.*

 Our review of the record reveals that the trial justice in this case scrupulously applied the oft-stated standard in denying Tarvis's motion for a new trial. He thoroughly reviewed the important evidence and articulated his belief in the credibility of the state's key witnesses. Moreover, we do not believe that the trial justice misconceived any material evidence or was in any way clearly wrong. Accordingly, we hold that the trial justice's denial of a motion for a new trial was correct in respect to every offense of which the jury found Tarvis guilty.

### B. *Speedy Trial*

A grand jury secretly indicted Tarvis on December 5, 1980, and he was arraigned on December 12, 1980. The trial did not begin until September 23, 1981. At that time the trial justice denied defendant's motion to dismiss the indictment for the lack of a speedy trial in violation of the State and Federal Constitutions.

 On appeal, defendant urges us to apply the four-part test of *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), as implemented by this court in *Tate*

*v. Howard,* 110 R.I. 641, 296 A.2d 19 (1972), and hold that the delay in the start of his trial deprived defendant of his constitutionally guaranteed right to a speedy trial. The factors of the *Barker* test consist of (1) length of the delay, (2) reasons for the delay, (3) assertion of the right to a speedy trial, and (4) prejudice to the accused caused by the delay, 407 U.S. at 530, 92 S.Ct. at 2192, 33 L.Ed.2d at 117. We shall consider each element separately.

### 1. *Length of Delay*

 The defendant asserts that the length of the delay should be measured from November 19, 1980. According to defendant a felony complaint was filed against him on that date. The record indicates only that a grand jury subsequently indicted defendant secretly and that he was arraigned several days after the indictment issued.

In *State v. Roddy,* R.I., 401 A.2d 23, 30 n. 4 (1979), we held that "[t]he 'arrest' or 'accusatory stage' constitutes the starting point for determining whether a defendant has been denied the right to a speedy trial." In this case, it might be contended that the date of the felony complaint was the date upon which the adversary judicial proceeding was commenced. *See Dillingham v. United States,* 423 U.S. 64, 65, 96 S.Ct. 303, 303–04, 46 L.Ed.2d 205, 207 (1975). It might also be argued that the "accusatory stage" in the proceedings against defendant did not commence until his arraignment in light of the secrecy of the indictment. *See State v. Crescenzo,* 118 R.I., 662, 669, 375 A.2d 933, 937 (1977). In any event, we shall assume without deciding that the date of the complaint is the time from which the pretrial delay should be measured because the period between the complaint and indictment and the indictment and arraignment respectively was very short.

Under this assumption the length of the delay in this case amounted to approximately ten months. This is probably the shortest period that has ever been asserted to this court in support of a claim of depriva-

tion of speedy trial based upon the guarantees of the United States and Rhode Island Constitutions. The seminal case respecting the speedy trial analysis under the Sixth Amendment was *Barker v. Wingo, supra.* That case involved a delay of approximately five years from the date of indictment to the end of trial (September 15, 1958, to October 9, 1963). In *Tate v. Howard, supra,* the length of delay measured from the time of arrest was approximately twenty months. In *State v. Roddy, supra,* the length of delay measured from the time of arrest was nearly thirty-four months. Obviously, the length of delay in this case is insufficient, in and of itself, to justify dismissal of the indictment. In *State v. Fortier,* R.I., 427 A.2d 1317 (1981), the length of delay measured from the indictment was more than eighteen months. Indeed, in *State v. Anthony,* R.I., 448 A.2d 744, 749 (1982), we found that a thirty-two-month delay did not establish a per se violation of the defendant's right to a speedy trial. In that case we held that the delay was presumptively prejudicial, thereby triggering the necessity of inquiring into the other three factors. In the case at bar, it is highly questionable whether the length of the delay is sufficient to require this court to address the other three factors set forth in *Barker v. Wingo, supra.*

In *State v. Palmigiano,* 112 R.I. 348, 309 A.2d 855 (1973), we applied the four-part test even though the delay between the time the defendant filed his motion for a speedy trial and the trial's start was only eleven months. The *Palmigiano* court, however, did not have the benefit of the "accusatory stage" standard for measuring the time period of a pretrial delay, as set forth in *State v. Roddy, supra.* If the court had applied this standard to the facts in *Palmigiano,* the court would have calculated a delay of approximately thirteen months because the motion for a speedy trial was filed well after the first accusatory proceeding, namely, the indictment. Nevertheless, we shall, for the purposes of this appeal, accept the *Palmigiano* court's computation of the length of delay as eleven months. At the same time, the fact that the *Palmigiano* decision preceded *Roddy* compels us to hold that the eleven-month standard that defendant argues *Palmigiano* established is now of questionable value.

■ We are of the opinion that the delay of approximately ten months in this case may be less than the minimal period needed for triggering a full-scale *Barker v. Wingo* analysis. Although we shall address the other three factors, we caution the bar that in a future case we may draw the line regarding "presumptively prejudicial" delay at twelve months in the absence of special circumstances. Although it is the announced policy of this court that felony trials should take place within six months of the indictment, such policy should not be construed as indicating that a failure to meet that goal in a particular case amounts to a denial of the right to a speedy trial guaranteed by art. I, sec. 10, of the Constitution of Rhode Island and the Sixth Amendment to the Constitution of the United States.

### 2. *Reasons for Delay*

The trial was first delayed on March 16, 1981, because the prosecutor had failed to supply grand jury tapes to defendant. During the summer of 1981 the trial was delayed twice, once because a key prosecution witness was on vacation and again because the prosecutor in the case was trying another case. These delays were all of the sort that commonly occur in criminal trials. Although the prosecution may have had some control over the grand jury tapes, the vacation decision of a witness who was a physician not under the direct control of the prosecutor could not be ascribed to the fault of the assistant attorney general to whom the case had been assigned. It should also be noted that the physician went on vacation during the month of August at a time when vacations are scarcely unusual. Further, part of the delay was due to conflicting assignments in other criminal trials by the attorney to whom the prosecution had

been assigned in this case. A further delay was encountered when, after the empaneling of a jury on September 23, 1981, one of the jurors was discovered not to understand the English language. All of the foregoing elements might be described as natural factors often encountered on the criminal-trial calendar and, for all practical purposes, are beyond the control of the prosecution. The ten-month delay was in no way caused by bad faith on the part of the state.

### 3. *Assertion of the Right*

No discussion of this factor is necessary because defendant filed a motion to dismiss the indictment on speedy-trial grounds soon after he was arraigned.

### 4. *Prejudice*

The defendant asserts that the death of one of the potential witnesses during the period in which the start of the trial was delayed prejudiced his defense. This person was William E. Cavanaugh, who witnessed the fight between Porraro and Jody at the Bonefero Club on November 18, 1980. Counsel suggested that Mr. Cavanaugh, if alive, would have testified that defendant Tarvis did not take part "on anyone's side" in this violent altercation. Counsel for the state also asserted that Mr. Cavanaugh would have been called as a witness by the state. In any event, none of the state's witnesses claimed that defendant Tarvis took part in the fight at the Bonefero Club. Any formation of intent by Tarvis, to which state's witnesses testified, related to events that occurred after the fight had concluded. Mr. Cavanaugh could have been of no assistance either to the state or to defendant Tarvis on this issue. We are therefore of the opinion that no prejudice resulted to defendant from the asserted delay in general and from the death of Mr. Cavanaugh in particular.

Each of the four factors in the *Barker v. Wingo* test "must be balanced against the others and assessed as a whole." *State v. Anthony,* 448 A.2d at 751–52. We have determined that the length of the delay,

approximately ten months, at best minimally favors defendant's claimed deprivation of his right to a speedy trial. In addition, we have found that the state's failure to turn over grand jury tapes and defendant's timely assertion of his right to a speedy trial weigh in his favor. On the other hand, none of the other causes of the delay could be attributed to the state. There was no evidence of bad faith on the part of the state, and the death of one of the state's witnesses did not prejudice defendant. On balance, therefore, we conclude that Tarvis's constitutionally guaranteed right to a speedy trial has not been abridged.

### C. *Fair Trial and Due Process*

The defendant's contention that the cumulation of errors deprived him of his right to a fair trial and due process has no merit because we have determined, point for point, that all of Tarvis's assertions of error are unpersuasive.

### III

### *Conclusion*

For the reasons stated, the appeals of both the defendants are denied and dismissed. The judgments of conviction are affirmed. The papers in the case may be remanded to the Superior Court.