STATE OF CONNECTICUT *v.* CHRISTOPHER G. BERNIER
(AC 15731)

Dupont, C. J., and Schaller and Ronan, Js.

Argued February 28—officially released August 26, 1997

*Jack Fischer*, assistant state's attorney, with whom, on the brief, were *Frank S. Maco*, state's attorney, and *Guy Wolf III*, senior assistant state's attorney, for the appellant (state).

*Joseph F. Keefe*, with whom, on the brief, was *A. Thomas Waterfall*, for the appellee (defendant).

*Opinion*

RONAN, J. The principal issue in this appeal is whether the state constitution, article first, § 7, requires that a search warrant be obtained prior to conducting laboratory tests on charred wood flooring samples seized from the defendant's home. The flooring samples were seized incident to an investigation to determine the cause and origin of a fire that caused substantial damage to the defendant's home.

The defendant, Christopher G. Bernier, was charged with arson in the first degree in violation of General Statutes § 53a-111.[1] The trial court denied the defen-

---

[1] General Statutes § 53a-111 provides in relevant part: "Arson in the first degree: Class A felony. (a) A person is guilty of arson in the first degree when, with intent to destroy or damage a building, as defined in section

dant's initial motion to suppress evidence obtained during a warrantless seizure incident to a fire investigation of the fire scene.[2] The court ruled that the warrantless seizure was legally justified due to exigent circumstances and because it was part of an investigation of the cause and origin of the fire. Thereafter, in an amended motion to suppress, the defendant moved to suppress as the fruit of an illegal search any and all evidence obtained as a result of the chemical analysis of the charred flooring samples. The trial court granted that motion and ordered the chemical analysis of the flooring samples suppressed. The trial court then granted the defendant's motion to dismiss the charges against him, and the state requested permission to appeal pursuant to General Statutes § 54-96.[3] Upon denial of this request by the trial court, the state moved for review of the trial court's denial and requested permission to appeal. The state's motion for review and permission to appeal was subsequently granted by this court. We affirm the judgment of the trial court.

The following facts and procedural history are relevant to the state's appeal. On November 15, 1990, the fire department of the town of Morris responded to a house fire alarm at the defendant's home. Firefighters

53a-100, he starts a fire or causes an explosion, and (1) the building is inhabited or occupied or the person has reason to believe the building may be inhabited or occupied; or (2) any other person is injured, either directly or indirectly; or (3) such fire or explosion was caused for the purpose of collecting insurance proceeds for the resultant loss; or (4) at the scene of such fire or explosion a peace officer or firefighter is subjected to a substantial risk of bodily injury. . . . ."

[2] The evidence included photographs and samples of charred flooring from the defendant's house.

[3] General Statutes § 54-96 provides: "Appeals by the state from Superior Court in criminal cases. Appeals from the rulings and decisions of the Superior Court, upon all questions of law arising on the trial of criminal cases, may be taken by the state, with the permission of the presiding judge, to the Supreme Court or to the Appellate Court, in the same manner and to the same effect as if made by the accused."

and equipment arrived at the scene at 8:37 a.m. to begin fire suppression measures. At 9:11 a.m., Joel Skilton, the local fire marshal, requested the state fire marshal's assistance in conducting an investigation to determine the cause and origin of the fire. At 10:53 a.m., Detectives James Pierpont and Julio Fernandez of the state fire marshal's office, arrived at the house and met with Skilton. Pierpont was accompanied by an accelerant detecting dog. The detectives and Skilton walked around the exterior of the house inspecting the fire damage and photographing the exterior. While taking photographs, they entered the interior of the home. As a part of their investigative inspection, they checked various rooms and moved various items of debris and furniture. In the living room, they observed a low burn pattern and pour patterns on the living room floor. These indicated the presence of a flammable liquid. Thereafter, the accelerant detecting dog was brought into the house. The dog alerted the fire investigators to several pour pattern areas. Because of those findings, four samples of charred wood flooring were taken from four different areas of the house. The cause and origin investigation was concluded prior to the investigators' leaving the scene of the fire.

The samples were placed in four separate cans and transmitted to the state police forensic science laboratory on November 16, 1990, the day after the fire. A moderate odor of petroleum was detected when the laboratory personnel opened one of the cans containing the samples. Gas chromatographic analysis revealed the presence of something similar to gasoline in three of the samples and a "medium range petroleum distillate" in all four samples. The laboratory report was dated November 29, 1990.

The state argues that although the trial court's decision rests on state constitutional grounds, it is based on an improper application of several Connecticut

Supreme Court decisions, particularly *State* v. *Joyce*, 229 Conn. 10, 639 A.2d 1007 (1994), and *State* v. *Miller*, 227 Conn. 363, 630 A.2d 1315 (1993). The state urges this court to adopt its view that a warrant was not and should not have been required to test the samples that were seized at the scene of the fire as part of the cause and origin investigation. The underlying rationale of the state's argument is that such a requirement would add little or no privacy protection, while unnecessarily hampering the compelling public interest in determining the cause and origin of a fire.

I

General Statutes § 29-311[4] entrusts the state fire marshal and any local fire marshal within his jurisdiction

[4] General Statutes § 29-311 provides: "Fire investigations. Warrant requirements. The Commissioner of Public Safety as State Fire Marshal, any local fire marshal within his jurisdiction, and all duly authorized fire and police personnel acting within their jurisdiction may enter into and upon any premises or building where any fire or explosion has occurred and premises adjacent thereto, without liability for trespass or damages reasonably incurred, to conduct investigations in accordance with sections 29-302 and 29-310, under the following circumstances and conditions:

"(a) During an emergency by reason of fire or explosion on any premises, they or any of them may, without a warrant, enter such premises during the suppression of the fire or explosion or within a reasonable period of time following the suppression thereof and remain for a reasonable period of time following the suppression of the fire or explosion to: (1) Investigate in order to determine the cause and origin of the fire or explosion, (2) prevent the intentional or unintentional destruction of evidence and (3) prevent a rekindling of the fire.

"(b) After expiration of a reasonable period of time following the suppression of the fire or explosion, they or any of them shall apply in writing under oath to any judge of the Superior Court for a warrant to enter upon the premises to determine the cause and origin of the fire or explosion, if such cause or origin has not been previously determined. The application shall describe: (1) The premises under investigation, (2) the owner or occupant of the premises, if reasonably ascertainable, (3) the date and time the fire or explosion which is the subject of the investigation was reported to a police or fire agency, and (4) the date and times during which the investigative activities to determine the cause and origin of such fire or explosion are to be conducted. The judge to whom an application for a warrant is made may issue such a warrant upon finding that the requirements of this

with the responsibility of investigating the cause and origin of any fire or explosion. General Statutes § 29-311 (a) allows a fire marshal to make a warrantless entry onto any premises where a fire or explosion had occurred in order (1) to investigate to determine the cause and origin of the fire or explosion, (2) to prevent the intentional or unintentional destruction of evidence and (3) to prevent a rekindling of the fire. Other statutory sections, including General Statutes §§ 29-302[5] and 29-310,[6] describe additional duties of the state and local fire marshals.

subsection have been met, and that the proposed activities are a reasonable intrusion onto the private premises to determine the cause and origin of the fire or explosion."

[5] General Statutes § 29-302 provides: "Investigations. The local fire marshal shall, in accordance with the provisions of section 29-311, investigate the cause, origin and circumstances of any fire or explosion within his jurisdiction, by reason of which property has been destroyed or damaged, or any person injured or killed, or any incidents which threatened any property with destruction or damage or any person with injury or death by reason of fire or explosion, and shall especially investigate whether such fire was the result of an incendiary device or the result of carelessness, design or any criminal act; and the Commissioner of Public Safety as State Fire Marshal, or the deputy fire marshal under his direction, may supervise and direct such investigation."

[6] General Statutes § 29-310 (a) provides: "The Commissioner of Public Safety as State Fire Marshal shall thoroughly investigate the cause, circumstances and origin of all fires or explosions to which his attention has been called, in accordance with the provisions of this part, by reason of which any property has been destroyed or damaged, or any person injured or killed, and shall especially examine and decide as to whether such fire was the result of carelessness, design, an incendiary device or any other criminal act. He may take the testimony under oath of any person supposed to be cognizant of or to have means of knowledge in relation to the matters as to which an examination is being made, and shall cause the same to be reduced to writing and filed in his office; and if, in his opinion, there is sufficient evidence to warrant that any person should be charged with the crime of arson or any other crime, he shall forthwith submit such evidence, together with the names of the witnesses and all other information obtained by him, to the proper prosecuting officer. He may, in any investigation, issue subpoenas for the purposes of summoning and compelling the attendance of witnesses before him to testify. He may administer oaths or affirmations to witnesses before him, and false swearing therein shall be perjury. He may, in the performance of his duties, enter, by himself or his assistants,

The constitutions of Connecticut and the United States " 'equally and conjointly prohibit unreasonable warrantless searches of private property. U.S. Const., amends. IV and XIV, § 1, Conn. Const., art. I, § 7.' " *State* v. *Zindros*, 189 Conn. 228, 238, 456 A.2d 288 (1983), cert. denied, 465 U.S. 1012, 104 S. Ct. 1014, 79 L. Ed. 2d 244 (1984); *Dotson* v. *Warden*, 175 Conn. 614, 618, 402 A.2d 790 (1978).

"[W]arrantless searches and seizures inside a house are presumptively unreasonable." *State* v. *Gant*, 231 Conn. 43, 63, 646 A.2d 835 (1994), cert. denied, 514 U.S. 1038, 115 S. Ct. 1404, 131 L. Ed. 2d 291 (1995); see *State* v. *Zindros*, supra, 189 Conn. 237; *State* v. *Vargas*, 34 Conn. App. 492, 496, 642 A.2d 47, cert. denied, 230 Conn. 907, 644 A.2d 921 (1994). The state bears the burden of showing that an exception to the warrant requirement applies. See *State* v. *Blades*, 225 Conn. 609, 618, 626 A.2d 273 (1993); *State* v. *Vargas*, supra, 496; *State* v. *Glenn*, 30 Conn. App. 783, 785, 622 A.2d 1024 (1993). "[A]bsent consent to entry or exigent circumstances, a judicial determination of probable cause must stand in between the police and the door of a person's home, whether the object of an entry is to search and seize or to arrest." (Internal quotation marks omitted.) *State* v. *Hill*, 237 Conn. 81, 92 n.17, 675 A.2d 866 (1996); *State* v. *Ruth*, 181 Conn. 187, 193, 435 A.2d 3 (1980).

In recent years, our Supreme Court has decided a number of cases on the basis of the state constitution noting that " 'the law of the land' may not, in state constitutional context, also be the 'law of the state of Connecticut.' " *State* v. *Dukes*, 209 Conn. 98, 113–14, 547 A.2d 10 (1988); see also *State* v. *Miller*, supra, 227 Conn. 379–80; *State* v. *Geisler*, 222 Conn. 672, 684, 610

into and upon the premises or building where any fire or explosion has occurred and premises thereto adjacent in accordance with the provisions of section 29-311."

A.2d 1225 (1992). The Supreme Court has pointed out that "federal constitutional and statutory law establishes a *minimum* national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights. . . . We have also, however, determined in some instances that the protections afforded to citizens of this state by our own constitution go beyond those provided by the federal constitution, as that document has been interpreted by the United States Supreme Court." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Morales,* 232 Conn. 707, 716–17, 657 A.2d 585 (1995); *State* v. *Marsala,* 216 Conn. 150, 160, 579 A.2d 58 (1990).

"In determining whether the results of [a] chemical test . . . should have been suppressed under the state exclusionary rule, as the product of a search that violated the state constitution, we employ the same analytical framework that would be used under the federal constitution. We must determine (1) whether there was a reasonable expectation of privacy in the [samples], (2) whether the testing of the [samples] at the state laboratory constituted a search, and (3) if so, whether the circumstances of this case fall within a recognized exception to the warrant requirement." *State* v. *Joyce,* supra, 229 Conn. 18–19. Here, the trial court conducted a fact specific inquiry into all the circumstances and made the determination that the defendant did manifest the requisite subjective expectation of privacy with respect to his living room floor and that expectation is one that society would consider reasonable. We conclude that (1) the defendant had an expectation of privacy in the samples and that expectation was reasonable, (2) the testing was a search within the meaning of article first, § 7, of the Connecticut constitution, and (3) the search did not fall within a recognized exception to the warrant requirement.

## A

For the samples to fall within the protection of article first, § 7, the defendant must have had a reasonable expectation of privacy. See *State* v. *Joyce*, supra, 229 Conn. 20; see also *State* v. *Hill*, supra, 237 Conn. 92. To meet this rule of standing, a two part test must be satisfied: (1) the owner or custodian of the property must have manifested a subjective expectation of privacy with respect to it; and (2) that expectation must be one that society would consider reasonable. See *State* v. *Hill*, supra, 92; *State* v. *Joyce*, supra, 20; *State* v. *DeFusco*, 224 Conn. 627, 633, 620 A.2d 746 (1993). This test is applied on a case-by-case basis. See *State* v. *Joyce*, supra, 20; *State* v. *Reddick*, 207 Conn. 323, 331, 541 A.2d 1209 (1988).

## 1

The state cannot persuasively argue that there is no reasonable expectation of privacy in one's home, just as in *Joyce* the state had to concede that there is such an expectation in "the clothes that one wears." *State* v. *Joyce*, supra, 229 Conn. 21. Here, the state contends that the defendant's privacy interests in the charred wood flooring samples from the defendant's home were "negligible—if not nonexistent." The state suggests that, because the samples of flooring were lawfully seized, the defendant no longer can claim a reasonable expectation of privacy in them. The *Joyce* court made it clear that even a claimed personal possession (clothing) that was presumably no longer fit for use (charred, wet, cut up etc.) was still a personal possession in which the owner had a legitimate expectation of privacy. See id., 23. The state's argument also fails in the face of the heightened protection that the Supreme Court and this court have granted to the privacy interest one has in one's home. See, e.g., *State* v. *Geisler*, supra, 222 Conn. 687–89; *State* v. *Mooney*, 218 Conn. 85, 111, 588

A.2d 145, cert. denied, 502 U.S. 919, 112 S. Ct. 330, 116 L. Ed. 2d 270 (1991).

In *Joyce*, our Supreme Court held that a warrantless chemical analysis of the defendant's wet, cut up and partially burned clothing constituted an unconstitutional search under article first, § 7, of the Connecticut constitution. As in *Joyce*, the defendant in the present case left his property behind out of necessity because of the fire in his home. He did nothing to suggest that he was discarding or abandoning his living room flooring. If anything, the facts in this case are more supportive of the defendant's subjective expectation of privacy than those in *Joyce*, in that the flooring seized was a part of the interior of the defendant's home as opposed to being a pile of wet, cut up, burned clothing found in the street.

2

The next issue is whether the defendant's subjective expectation of privacy is one that society would consider objectively reasonable. See *State* v. *DeFusco*, supra, 224 Conn. 633.

"Whether a defendant's actual expectation of privacy . . . is one that society is prepared to recognize as reasonable involves a fact-specific inquiry into all the relevant circumstances." (Internal quotation marks omitted.) *State* v. *Hill*, supra, 237 Conn. 92. "In reviewing this claim, this court must take the facts found by the trial court unless those facts are clearly erroneous." *State* v. *Carter*, 22 Conn. App. 118, 122, 576 A.2d 572 (1990); see also *State* v. *Pittman*, 209 Conn. 596, 601, 553 A.2d 155 (1989); *State* v. *Zindros*, supra, 189 Conn. 242. "A trial court's finding that a defendant did not have a reasonable expectation of privacy in the area searched may not be overturned by the reviewing court unless it is legally or logically inconsistent with the facts found or involves an erroneous rule of law."

(Internal quotation marks omitted.) *State* v. *Torres,* 36 Conn. App. 488, 499, 651 A.2d 1327, cert. denied, 232 Conn. 912, 654 A.2d 357 (1995).

The location of the place searched can be an important factor indicating whether a person's expectation of privacy is one that society is prepared to recognize as reasonable. See, e.g., id., 500. "[E]xpectations of privacy in some places are afforded greater constitutional legitimacy than in others." (Internal quotation marks omitted.) *State* v. *Mooney,* supra, 218 Conn. 94–95; see *State* v. *DeFusco,* 27 Conn. App. 248, 259, 606 A.2d 1 (1992), aff'd, 224 Conn. 677, 620 A.2d 746 (1993). "In considering whether an expectation of privacy in a particular place is one that society is prepared to recognize as reasonable, we ask whether it is one in which society is prepared, because of its code of values and its notions of custom and civility, to give deference to a manifested expectation of privacy." (Internal quotation marks omitted.) *State* v. *Mooney,* supra, 110.[7] The

[7] "The courts have identified a number of factors indicating that a person's expectation of privacy in a particular place is one that society is not prepared to recognize as reasonable. Where the person occupying the property is a trespasser, ordinarily he has no reasonable expectation of privacy in that place. *United States* v. *Ruckman,* [806 F.2d 1471, 1473 (10th Cir. 1986)]; *Amezquita* v. *Hernandez-Colon,* 518 F.2d 8, 11 (1st Cir. 1975), cert. denied, 424 U.S. 916, 96 S. Ct. 1117, 47 L. Ed. 2d 321 (1976); see also *Rakas* v. *Illinois,* [439 U.S. 128, 143–44 n.12, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978)] . . . . Furthermore, leaving one's property in an area 'readily accessible to animals, children, scavengers, snoops, and other members of the public' may render one's expectation of privacy less than reasonable. *California* v. *Greenwood,* 486 U.S. 35, 40, 108 S. Ct. 1625, 100 L. Ed. 2d 30 (1988) . . . . 'Hence, "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." ' Id., 41, quoting *Katz* v. *United States,* [389 U.S. 347, 351, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967)]." *State* v. *Mooney,* supra, 218 Conn. 96; see also *Washington* v. *Meachum,* 238 Conn. 692, 723–24, 680 A.2d 262 (1996) (correctional institution inmates' expectation of privacy in their nonprivileged telephone calls "is not one that the citizens of our state would recognize as reasonable" because of need for institutional security and general law of privacy attendant upon incarceration).

Such factors are "relevant as helpful guides, but should not be undertaken mechanistically. They are not ends in themselves; they merely aid in evaluat-

fact that the search took place elsewhere, i.e., the state forensic laboratory, is not the relevant consideration. The germane consideration in this case is the area from which the item searched was taken. This area was not exposed or accessible to the public in any way. The samples searched were taken from a personal residence belonging to the defendant.

Ownership is another important factor in determining whether society will view an expectation of privacy as a reasonable one. See, e.g., *State* v. *Zindros*, supra, 189 Conn. 246. Legitimate expectations of privacy may derive from concepts of real or personal property law. *State* v. *Hill*, supra, 237 Conn. 94 n.19. "One of the main rights attaching to property is the right to exclude others . . . and one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude." (Citation omitted; internal quotation marks omitted.) Id.; *State* v. *Mooney*, supra, 218 Conn. 95. Given these considerations, the defendant's ownership of the building from which the charred flooring was taken may well be, alone, enough of a factual foundation for society to view his expectation of privacy as reasonable.

These two factors, location and ownership, are present in tandem in cases, such as this one, involving searches of a person's home. "Privacy expectations are normally highest and are accorded the strongest constitutional protection in the case of a private home . . . ."[8] *State* v. *Brown*, 198 Conn. 348, 356–57, 503 A.2d

ing the ultimate question in all fourth amendment cases—whether the defendant had a legitimate expectation of privacy, in the eyes of our society, in the area searched." (Internal quotation marks omitted.) *State* v. *Mooney*, supra, 218 Conn. 97.

[8] While it is true that, "[e]ven in a private home . . . there is no absolute protection of privacy"; *State* v. *Brown*, 198 Conn. 348, 357, 503 A.2d 566 (1986); the defendant here did nothing to indicate his expectation of privacy was lessened. He did not "knowingly expose to the public"; id.; any part of the home, nor was the object searched "visible to others in areas expressly or impliedly open to the public . . . ." Id., 356–57.

566 (1986); see *State* v. *DeFusco*, supra, 224 Conn. 634 (explicitly recognizing strongest protections under state constitution for expectations of privacy in home); *State* v. *Geisler*, supra, 222 Conn. 687. A person's presence in his or her home " 'raises a reasonable inference that he intends to have privacy, and if that inference is borne out by his actions, society is prepared to recognize his privacy.' " *State* v. *Benton*, 10 Conn. App. 7, 10, 521 A.2d 204 (1987), aff'd, 206 Conn. 90, 536 A.2d 572 (1988).[9] At the very core of the state and federal constitutional protections against unwarranted search and seizure "stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion. . . . The right of officers to thrust themselves into a home is . . . a grave concern, not only to the individual but to a society which chooses

[9] As the Connecticut Supreme Court stated in *Geisler*: "The sanctity of the home has a well established place in our jurisprudence. The English common law, upon which much of this country's constitutional and common law is based, recognized that intrusion into the home constituted an especially egregious conduct. From earliest days, the common law drastically limited the authority of law officers to break the door of a house to effect an arrest. Such action invades the precious interest of privacy summed up in the ancient adage that a man's house is his castle. As early as the 13th Yearbook of Edward IV (1461–1483), at folio 9, there is a recorded holding that it was unlawful for the sheriff to break the doors of a man's house to arrest him in a civil suit in debt or trespass, for the arrest was then only for the private interest of a party. Remarks attributed to William Pitt, Earl of Chatham, on the occasion of debate in Parliament on the searches incident to the enforcement of an excise on cider, eloquently expressed the principle: The poorest man may in his cottage bid defiance to all the forces of the crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter—all his force dares not cross the threshold of the ruined tenement! *Miller* v. *United States*, 357 U.S. 301, 306–307, 78 S. Ct. 1190, 2 L. Ed. 2d 1332 (1958). In discussing burglary, defined as nocturnal house-breaking, Blackstone wrote, [a]nd the law of England has so particular and tender a regard to the immunity of a man's house, that it styles it his castle, and will never suffer it to be violated with impunity . . . . 4 Blackstone's Commentaries (1822) p. 222." (Internal quotation marks omitted.) *State* v. *Geisler*, supra, 222 Conn. 687–88; *State* v. *Santiago*, 224 Conn. 494, 520, 619 A.2d 1132 (1993).

to dwell in reasonable security and freedom from surveillance." (Citations omitted; internal quotation marks omitted.) *State* v. *Geisler*, supra, 689–90. The fact that the defendant's house was burned does not mean his expectation of privacy is any less reasonable because "a fire does not necessarily diminish the owner's reasonable expectation of privacy in the burned building." *State* v. *Schonagel*, 189 Conn. 752, 761, 459 A.2d 106 (1983), vacated and remanded, 465 U.S. 1002, 104 S. Ct. 990, 79 L. Ed. 2d 224, withdrawal of appeal noted, 192 Conn. 652, 473 A.2d 300 (1984). Warrantless searches and seizures inside a home are presumptively unreasonable. See *State* v. *Gant*, supra, 231 Conn. 63; *State* v. *Zindros*, supra, 189 Conn. 237; *State* v. *Scott*, 27 Conn. App. 403, 406, 606 A.2d 720, cert. denied, 222 Conn. 911, 608 A.2d 1184 (1992). Here, where the defendant left his home to go to work, there is nothing about the factual circumstances to support the conclusion that the state has overcome the presumption.

We conclude that the defendant's expectation was one that society would deem reasonable because (1) the place searched is one that society traditionally regards as worthy of considerable protection, (2) the defendant was the owner of the property searched and society views ownership as providing safeguards against invasions of privacy and (3) society affords a particularly high degree of deference to expectations of privacy in the home. "We believe that under these particular circumstances, society's code of values and its notions of custom and civility would cause it to recognize as reasonable the defendant's expectation of privacy . . . ." *State* v. *Mooney*, supra, 218 Conn. 111–12.

Additionally, employing a balancing test as is used in some circumstances; see id., 96; we conclude that, in this case, weighing society's interest in law enforcement

against the defendant's expectation of privacy, "we perceive no significant impairment of society's interest in law enforcement by requiring the police in this case to have secured a warrant before searching the defendant's [home], in order to preserve the same privacy interest." Id., 112. "In determining that the exclusionary rule should be invoked to suppress evidence under the state constitution, we are mindful of the costs to society that result from excluding such evidence." *State* v. *Geisler*, supra, 222 Conn. 686. We are also cognizant, however, that failure to invoke the exclusionary rule provides incentives for law enforcement officials to ignore proscriptions of the state constitution. See id., 687.

We reject the state's argument that the defendant's expectation was objectively unreasonable. The state claims that, in the context of this case, the overruling interest in public safety outweighs the defendant's privacy interests. The state's reasoning appears to be that the objective reasonableness requirement may be informed by the statutes requiring thorough cause and origin investigations—i.e., that society would not consider reasonable an expectation of privacy that would thwart the compelling public interest in the protection of human life and safety served by the statutorily required cause and origin investigations. Statutes, it is true, in some circumstances help define the contours of constitutional rights. See *State* v. *Lamme*, 216 Conn. 172, 180–81, 579 A.2d 484 (1990); cf. *State* v. *Joyner*, 225 Conn. 450, 468, 625 A.2d 791 (1993). The statutes requiring thorough cause and origin investigations may have as their purpose the same goal—the protection of life and safety—as the arson statutes. Cf. *State* v. *Parmalee*, 197 Conn. 158, 163 n.5, 496 A.2d 186 (1985). We need not determine, however, whether we need to carve out an exception based on this reasoning because, in this case, there was testimony by Skilton, the Morris

fire marshal, that the cause and origin investigation was completed on the day of the fire, i.e., at the scene, and the trial court properly made that finding. Skilton's testimony provides a basis for the trial court's finding, which is not clearly erroneous. Thus, there is no adequate rationale for allowing a search under a cause and origin exception.[10]

### B

The next question is whether the testing done on the charred wood flooring samples constituted a search within the meaning of article first, § 7. The answer "borders on the obvious." *State* v. *Joyce*, supra, 229 Conn. 23. It cannot be disputed that the government examined the samples "through the use of a machine designed to detect the presence and identity of many organic compounds by heating clothing items and analyzing the resultant vapors." Id., 24. The trial court correctly concluded that "this chemical test, capable of determining a multitude of private facts about an individual, constituted a search under article first, § 7, of the state constitution." Id.

### C

The third part of the test of whether the search was made in violation of article first, § 7, of the state constitution involves a determination of the applicability of any recognized exception to the warrant requirement. The state argues that the test results need not be suppressed because (1) the search was conducted incident

---

[10] We note, however, that the state's conclusion that the public safety interests outweigh the individual's privacy interests does not necessarily follow from its reasoning. If it did, there would be virtually limitless exceptions to the warrant requirement, since many criminal statutes have as their goals the protection of human life and safety. Given this court's and our Supreme Court's view of the sanctity of the home and the clearly expressed preference for warrants, this conclusion does not comport with precedent. Cf. *State* v. *Zindros*, supra, 189 Conn. 260–61 (*Spada, J.*, dissenting).

to exigent circumstances, (2) the search was made pursuant to the police's investigatory function rather than their community caretaking function and, therefore, *Joyce* is inapplicable, (3) the search was similar to the search made incident to the arrest in *State* v. *Castagna*, 170 Conn. 80, 364 A.2d 200 (1976), and thus that case controls.

1

The four samples of charred wood flooring were seized by the fire marshal investigators at the scene of the fire during their cause and origin investigation. The trial court properly found that the entry and reentry into the defendant's premises to investigate the cause and origin of the fire, as well as the seizures of the four samples, were consistent with the exigencies of the situation.

The state, disputing the subsequent suppression of the laboratory tests of the seized flooring samples, argues that this search was a part of the cause and origin investigation required by the exigent circumstances flowing from the fire.

"The phrase 'exigent circumstances' refers generally to those situations in which law enforcement agents will be unable or unlikely to effectuate an arrest, search or seizure, for which probable cause exists, unless they act swiftly and, without seeking prior judicial authorization." *United States* v. *Campbell*, 581 F.2d 22, 25 (2d Cir. 1978); see *State* v. *Gant*, supra, 231 Conn. 63–64; *State* v. *Scott*, supra, 27 Conn. App. 407.

While the seizure of the samples can be found to have occurred due to the exigency of the on-the-scene fire investigation, the same conclusion cannot be reached as to the laboratory tests. The living room flooring samples, once seized, were in the safe care of law enforcement personnel. The samples were safeguarded

in a state police evidence locker and were no longer subject to tampering, removal or further destruction. Furthermore, time was not a factor, and there is no evidence to suggest that the laboratory tests would be flawed if the testing was not conducted post haste.

The exigencies of the fire scene seizure do not serve to justify the subsequent warrantless search by means of laboratory testing of the seized wood flooring. The United States Supreme Court and our Supreme Court have " 'repeatedly emphasized that mere convenience or saving of time will not excuse the failure to obtain a warrant. Some element of emergency must exist which would render a search ineffective if delayed by the time necessary to get a warrant.' " *State* v. *Guertin*, 190 Conn. 440, 448–49, 461 A.2d 963 (1983); *State* v. *Krause*, 163 Conn. 76, 81, 301 A.2d 234 (1972).

2

The state also asserts that the seizure of the clothing in *Joyce* was made by the police pursuant to their community caretaking function, as opposed to a seizure that was made pursuant to an investigation, as in this case. The state urges that this distinction—community caretaking versus investigatory seizures—is the prime reason that the decision of the Supreme Court in *Joyce* is inapplicable and should not have been relied on by the trial court.

The community caretaking function serves several interests, including protecting the owner's personal property, deterring false claims against the police, protecting the police from danger potentially posed by the property, and inhibiting careless handling of articles taken from arrested persons. See *State* v. *Gasparro*, 194 Conn. 96, 108, 480 A.2d 509 (1984), cert. denied, 474 U.S. 828, 106 S. Ct. 90, 88 L. Ed. 2d 74 (1985); *State* v. *Billias*, 17 Conn. App. 635, 641, 555 A.2d 448 (1989).

The United States Supreme Court first described the community caretaking functions in *Cady* v. *Dombrowski*, 413 U.S. 433, 93 S. Ct. 2523, 37 L. Ed. 2d 706 (1973). There, the Supreme Court stated that "[l]ocal police officers, unlike federal officers, frequently . . . engage in what, for want of a better term, may be described as community caretaking functions, totally devoid from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." Id., 441.

Obviously, the investigatory function, which includes the acquisition of evidence related to a possible criminal violation, is normally not conducted for any of the foregoing reasons. Thus, the distinction the state is suggesting should be drawn here is not persuasive or supportable in light of the often enunciated preference for search warrants. See *State* v. *Joyce*, supra, 229 Conn. 25; *State* v. *Miller*, supra, 227 Conn. 385–86; see generally *State* v. *Geisler*, supra, 222 Conn. 686–89.

The reasoning of the *Joyce* court is not logically diminished in any way by the distinction between community caretaking and investigatory seizures and searches. If anything, a finding that a search was made pursuant to the police's investigatory functions rather than their caretaking functions is apt to enhance the likelihood that the protections of article first, § 7, would attach.

3

The state also claims that the trial court's ruling ignored the holding of the case most on point, *State* v. *Castagna*, supra, 170 Conn. 80. In *Castagna*, the defendant claimed that article first, § 7, of the Connecticut constitution, as well as the federal constitution, required suppression of the results of tests made of his clothing that had been taken from him by police without a search warrant approximately six hours after his arrest. The defendant contended that the seizure of his

clothing and the testing done on the clothes were too remote from his arrest to be considered part of the search incident to the arrest and that a warrant should have been obtained. In rejecting this claim, our Supreme Court relied on the reasoning of the United States Supreme Court in *United States* v. *Edwards*, 415 U.S. 800, 804–805, 92 S. Ct. 1234, 39 L. Ed. 2d 771 (1974), where it was held that because the defendant was under arrest, the police were entitled to take any evidence from the defendant's possession, i.e., his clothing, and subject it to laboratory analysis.

*Castagna* is distinguishable from this case for several reasons. First, while the defendant claimed protection under article first, § 7, of the state constitution, *Castagna* was decided under the federal fourth amendment. The decision included no separate state constitutional analysis and is grounded solely on the fourth amendment. Second, this decision was based on the fact that the search was incident to a lawful arrest. That recognized exception to the warrant requirement is inapplicable to the present case. Third, the *Castagna* facts are that the search was made after the defendant was in lawful custody and involved only those possessions that he had with him when he was taken into custody. In this case, the defendant was not in custody when the samples were seized or searched. Consequently, the seized flooring samples did not find their way into the custody of the law enforcement officers in the same manner as the clothing in *Castagna*. Fourth, in *Castagna* the seizure was made the next day, which the court found was as soon as reasonably possible. In the present case, while some of the items seized were transported to the state laboratory the day after the fire, it is unclear when the testing, i.e., the search, took place; it could have been any time between the day after the fire to two weeks after the fire. There is nothing in the record to indicate that the testing was done as

soon as reasonably possible. The state finally claims that *Castagna* stands for the proposition that "evidence . . . validly seized and in the custody of the police . . . may be tested or analyzed within a reasonable time without the need for a warrant." The application of that holding to this case must be tested in light of the particular facts and circumstances of *Castagna* as opposed to this case. As previously discussed, the *Castagna* facts and circumstances are different in many ways from those of *Joyce* and this case. We conclude that *Joyce* and its predecessor cases compel a different conclusion than *Castagna*.

## II

The state also argues that the trial court's ruling should not be upheld because the holding of *Joyce* that a search warrant was required for laboratory testing of the seized objects, i.e., the samples of flooring, should be applied prospectively. In support of this argument, the state points out that the fire investigation in this case occurred in 1990, four years before *Joyce* was decided. The contention is that the fire and police investigators acted in good faith reliance on the fact that no warrant was needed to test the samples of wood flooring.

The facts in *Joyce* involved the same testing procedures, performed in the same laboratory, for the same purposes as in this case. The testing procedures in *Joyce* were conducted in the spring of 1990 whereas the testing in this case occurred in November of 1990.

While the state correctly points out that law enforcement considerations may sometimes outweigh the interests of retroactive applications; see *State* v. *Ryerson*, 201 Conn. 333, 340, 514 A.2d 337 (1986); as a general rule, judicial decisions apply retroactively. See *Robinson* v. *Neil*, 409 U.S. 505, 507–508, 93 S. Ct. 876, 35 L. Ed. 2d 29 (1973). Indeed, a legal system based on

precedent has a presumption of retroactivity. See *Solem* v. *Stumes*, 465 U.S. 638, 642, 104 S. Ct. 1338, 79 L. Ed. 2d 579 (1984); *State* v. *Marsala*, 42 Conn. App. 1, 4–5, 679 A.2d 367, cert. denied, 239 Conn. 912, 682 A.2d 1010 (1996) (test for reviewing warrants applied retroactively); *State* v. *Jackson*, 32 Conn. App. 724, 731–32 n.6, 630 A.2d 164, cert. denied, 228 Conn. 903, 634 A.2d 296 (1993).

In *Neyland* v. *Board of Education*, 195 Conn. 174, 179, 487 A.2d 181 (1985), our Supreme Court, in reviewing the "comprehensive if somewhat confusing" federal court rules[11] on retroactivity, described the three part test set down in *Chevron Oil Co.* v. *Huson*, 404 U.S. 97, 92 S. Ct. 349, 30 L. Ed. 2d 296 (1971). "First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied . . . or by deciding an issue of first impression whose resolution was not clearly foreshadowed . . . . Second, it has been stressed that we must . . . weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further retard its operation. . . . Finally, we have weighed the inequity imposed by retroactive application, for [w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the injustice or hardship by a holding of nonretroactivity." (Citations omitted; internal quotation marks omitted.) *Neyland* v. *Board of Education*, supra, 179–80.

The state's argument against retroactivity fails to meet the first prong of the test in *Chevron Oil Co*. The

[11] The United States Supreme Court addressed the issue of retroactivity in *Linkletter* v. *Walker*, 381 U.S. 618, 85 S. Ct. 1731, 14 L. Ed. 2d 601 (1965). In *Linkletter*, the court applied its holding in *Mapp* v. *Ohio*, 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961), to cases that were pending on direct appeal at that time.

decision in *Joyce* cannot be viewed as a new rule of law that is a clear break with the past or as a decision that was not clearly foreshadowed. While the *Joyce* decision can be said to have enlarged the constitutional rights of criminal defendants, it did not overrule established state constitutional precedent. Given the general decisional support for retroactivity, there must be cogent reasons to tip the scale and hold otherwise. Such reasons are lacking in this case.

The judgment is affirmed.

In this opinion DUPONT, C. J., concurred.

SCHALLER, J., dissenting. Because I conclude that a warrant was not required to test the charred wood flooring samples that were lawfully seized at the scene of the fire during the course of the cause and origin investigation, I respectfully dissent. My analysis differs from the majority opinion in two basic respects. First, I believe that the trial court's finding that the investigation of the cause and origin of the fire was completed on the day of the fire was clearly erroneous. Second, I disagree that the defendant's subjective expectation of privacy was one that citizens of Connecticut would consider reasonable.

I

The majority determines that the trial court properly found that the investigation was completed on the day of the fire. The majority bases its determination on the testimony of Joel Skilton, fire marshal of the town of Morris. Although Skilton did testify at the suppression hearing that he believed the cause and origin investigation was completed sometime before the investigators left the defendant's home on the day of the fire, Detective Julio Fernandez, Jr., investigator with the state fire marshals' office, testified to the contrary. In his testimony, Fernandez stated that the cause of the fire

in this case absolutely depended on an entire examination of the fire scene *plus subsequent laboratory analysis*. He testified that his duty as state fire marshal to investigate the cause and origin of fires consists of two inquiries—one is cause and the other is origin—and that in this case, although he believed that he had accurately determined the origin of the fire, *he could not accurately determine the cause of the fire until the laboratory analysis on the flooring samples was completed*. The trial court, therefore, should have credited Fernandez' testimony in light of the fact that Skilton called Fernandez to the scene to supervise the investigation. See General Statutes § 29-302 (state fire marshal may supervise and direct fire investigation conducted by local fire marshal). Simply because Skilton's duties as local fire marshal may have been concluded when he left the scene, Fernandez' duty to investigate thoroughly the cause and origin of the fire was not complete and, according to his testimony, would not be so until he was able to evaluate the laboratory analysis of the flooring samples.

Additionally, § 29-302 mandates that the local fire marshal and General Statutes § 29-310 mandates that the state fire marshal "thoroughly investigate the cause . . . of all fires . . . to which his attention has been called . . . ." In this case, a vital part of the fire marshal's thorough investigation was the testing of the charred wood flooring samples to determine whether an accelerant had been used. Accordingly, it was improper for the trial court to conclude that the cause and origin investigation specifically authorized by §§ 29-302 and 29-310 was completed on the day of the fire.

## II

The majority further determines that the defendant's subjective expectation of privacy with respect to his

charred living room floor was one that the citizens of our state would consider reasonable. I disagree.[1]

There is no doubt that "[t]he sanctity of the home has a well established place in our jurisprudence"; *State* v. *Geisler*, 222 Conn. 672, 687, 610 A.2d 1225 (1992); and that warrantless searches and seizures inside a home are presumptively unreasonable. Id., 681, citing *Payton* v. *New York*, 445 U.S. 573, 585, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980). In fire investigation cases, however, our legislature has expressly authorized state officials to conduct a warrantless search in a house where a fire has occurred and to seize any such materials that may be useful in determining the cause and origin of the fire. See General Statutes § 29-311. Moreover, our legislature has clearly authorized and directed the state fire marshal to "thoroughly investigate the cause, circumstance and origin of all fires . . . to which his attention has been called . . . ." General Statutes § 29-310; see also General Statutes § 29-302. It would be incongruous, therefore, to conclude that the legislature authorized, within the course of a cause and origin fire investigation, a seizure of investigative materials but failed to provide for the completion of the investigation by allowing the testing of those materials. If that were the case, fire officials would be required to establish probable cause for a search warrant, *without access to the crucial test results*, in order to gain access to the materials seized for testing. Clearly, the investigation authorized in §§ 29-302, 29-310 and 29-311 contemplated both the *seizure* and *testing* of those materials without the need for *additional* authorization, the original *thorough investigation and seizure* already having been authorized.

---

[1] For purposes of this opinion, I accept the conclusion that the testing at the state laboratory constituted a search and that the defendant manifested a subjective expectation of privacy with respect to his charred living room floor.

Furthermore, the fire investigation statutes have as their compelling purpose the protection of human life and safety of the public.[2] This legislative expression points to the conclusion that citizens of our society would not consider reasonable an expectation of privacy in the lawfully seized charred wood flooring samples when weighed against the public interest in the protection of human life and safety served by the statutory requirement of a thorough cause and origin investigation. Although "[o]ur constitutional preference for warrants is overcome only in specific and limited circumstances"; *State* v. *Miller*, 227 Conn. 363, 383, 630 A.2d 1315 (1993); in this case, where the legislature has expressed an overriding public policy interest and where practicalities demand it, the state officials should not be required to obtain a warrant in order to test the charred wood flooring samples as part of their cause and origin investigation.

The majority relies heavily on *State* v. *Joyce*, 229 Conn. 10, 639 A.2d 1007 (1994), for the proposition that our state constitution requires an additional warrant to test the validly seized material. I believe, however, that *Joyce* is distinguishable from this case. First, *Joyce* involved the limited community caretaking function as opposed to the thorough investigation for reasons of public safety and preservation of human life. Second, the seizure of personal articles of clothing in *Joyce* did not involve the *element of plain smell* or plain view.[3]

[2] Statutes may, in some circumstances, help to define the contours of constitutional rights. See *State* v. *Joyner*, 225 Conn. 450, 468, 625 A.2d 791 (1993); *State* v. *Lamme*, 216 Conn. 172, 180–81, 579 A.2d 484 (1990).

[3] Here, the state's chemist testified that he smelled gasoline when he opened the can containing one of the pieces of the charred wood. In *State* v. *Joyce*, supra, 229 Conn. 22, the court made note of the fact that there was no evidence that the defendant's clothing emitted "any odor detectable by the human sense of smell." Since this would be analogous to a plain view discovery, it may be unreasonable for a person to have an expectation that such a fact would be private. *State* v. *Wilson-Bey*, 21 Conn. App. 162, 166–67, 572 A.2d 372 (1990), this court cited with approval a United States

Id., 22 n.14. Third, nothing in the *Joyce* majority opinion suggests that the holding would extend to this situation in which the seizure was authorized and directed by arson statutes specifying an overriding policy concern for public safety.

Finally, I note that a persuasive decision of the Rhode Island Supreme Court crystallizes this analysis. *State v. Moretti*, 521 A.2d 1003 (R.I. 1987), is a decision of the Rhode Island Supreme Court involving remarkably similar factual circumstances. In *Moretti*, a fire inspector seized samples of flooring and furniture in the course of his cause and origin investigation. The defendant challenged the subsequent testing, which occurred in "due course." Id., 1005. The Rhode Island Supreme Court, referring to *Michigan* v. *Tyler*, 436 U.S. 499, 98 S. Ct. 1942, 56 L. Ed. 2d 486 (1978), recognized the valid warrantless seizure of evidence while inspecting the premises in the course of determining the cause of a fire, and concluded: "No principle of constitutional law requires any law enforcement official to obtain a warrant prior to testing any item seized during a valid search. To hold otherwise in this case would be effectively to neutralize the power of the governmental fire inspector, who is expected by his or her employer to determine the cause and origin of fires occurring within the inspector's area of responsibility and to prevent them in the future." *State* v. *Moretti*, supra, 1009. This reasoning is fully applicable to this case.

For the foregoing reasons, I respectfully dissent.

---

Supreme Court case in which a fire investigation turned up equipment that later was identified as drug manufacturing equipment. In that case, all the items were seized during the overhaul procedure as part of the cause and origin investigation, and all of the items were in plain view of the investigators. "Once the investigators were legitimately inspecting the refrigerator, the evidence they found therein was in plain view." Id., 167.